Larry S. GONDELMAN,
et al., Petitioners,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF CONSUMER & REGULA-
TORY AFFAIRS, Respondent.

No. 00–AA–1531.

District of Columbia Court of Appeals.

Argued Jan. 3, 2002.

Decided Jan. 17, 2002.

Larry S. Gondelman, pro se.

Mary T. Connelly, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for respondent.

Before SCHWELB, FARRELL and REID, Associate Judges.

REID, Associate Judge:

In this case, the Mayor's Agent for Historic Preservation for the District of Columbia ("the Mayor's Agent") denied "the [a]pplication for a curb cut and the related adjustments that would be made to the front of the real property located at 1924 Belmont Street, N.W., [in the Kalorama Historic District in] Washington, D.C." The application sought a preliminary permit, mainly to construct a garage on residential property and to excavate the berm and pave a portion of the front yard. Petitioners Larry S. Gondelman and Pauline Sobel ("the petitioners") challenge the Mayor's Agent's conclusion that their application does not meet the requirements of the District of Columbia Historic Landmark and Historic District Protection Act ("the Act"), D.C.Code §§ 5–1001 *et seq.* (1994), recodified as §§ 6–1101 *et seq.* (2001).[1] We affirm.

## FACTUAL SUMMARY

The record on review shows that the area of the District known as Kalorama Triangle, and which encompasses the petitioners' residential property, was designated as part of the National Register of Historic Places in 1986. Subsequently, around March 2000, the petitioners sought a permit to make alterations to their residential property, including a curb cut and disturbance of the berm, to allow construction of a garage under the front of their attached row house.

A staff reviewer for the Historic Preservation Review Board ("the HPRB") recommended that the petitioners' application be denied "because the alterations are not consistent with the purposes of the preservation law." Specifically, the staff reviewer stated:

---

1. The references to the Act in this opinion will be taken from the 2001 D.C.Code.

The owner, Larry Gondelman, seeks conceptual approval for a curb cut, front yard driveway, and new garage located beneath the existing front porch of this landlocked contributing rowhouse.

Typical of many houses in the Kalorama Triangle neighborhood, this early–20th-century Mission Style rowhouse is enhanced by the berm in its front yard, some of which is in public space. Historically, the front yards in Kalorama Triangle did not incorporate fences, nor paved areas, as fencing and paving were contrary to uninterrupted lawn aesthetic as defined by the surburban ideal.

The proposals to excavate the berm, pave most of the front yard, and introduce a garage below the front porch are not compatible alterations with the character of this rowhouse nor the historic district in general. Moreover, the paving of public space in historic districts, which was intended for planting is not consistent with the city's comprehensive plan.

Following the staff reviewer's report and recommendation, the HPRB held a public hearing on May 9, 2000, to consider the petitioners' application. In addition to Mr. Gondelman, testimony was given in behalf of the petitioners by Dixon Carroll, an architect, Emily Eig, an architectural historian who directed the survey that resulted in the addition of the Kalorama Triangle on the National Register of Historic Places, and Richard Nettler, then the petitioners' attorney. Mr. Gondelman explained how he intended to alter and enhance his property to meet the needs of the 21st Century in which the private vehicles play a major role; and why his proposed alteration would not lead others in the area to make the same request. He

also mentioned other houses located near his property which have "front parking pads." Ms. Eig asserted that the "design [for petitioners' proposed alterations] works with the neighborhood. It is subtle, it is low-key, it is not trying to be something different than what it is, and it is not very dissimilar from houses that were designed with garages in similar neighborhoods." She limited her assessment, in terms of additional parking garages under houses in the area, to the petitioners' residence, indicating that the grade of the ground on which the house sits and the facade of the house are different from others in the block.[2]

Mr. Charles Dynes, representing the Kalorama Citizens Association at the HPRB's May 2000 public hearing, testified against the petitioners' application. He maintained that, "the berm is terribly important." He pointed out that the historic districts in Cleveland Park and Mt. Pleasant have houses with porches, and that: "In the Kalorama Triangle ... [the] berm is probably more important than the curb cut, although they're tied together." He added:

> [T]he berms are a distinguishing feature, and on Belmont this particular set of berms is very important. If you stand down on 20th [Street], or if you stand up on 19th [Street], and you look up or down the street, on one side you will see this new development which is really not very good looking.... But one thing you will notice is no curb cuts.... And on the other side you'll see some curb cuts. You will see an alley in the middle of the street. Below that alley you'll see these half dozen row houses, all of [which] have a wall and a

**2.** As Ms. Eig stated: "Just this house in this instance, because of the circumstances of the Kalorama Place across the street, [i.e., "a very large housing development," and] the

design of the—the composition of the house itself, the grade of the ground that the house sits on [.]"

berm, and those berms are stepped up. And it's really kind of nice to stand up on 19th or down on 20th and look at that side of the street and see what this neighborhood has looked like since the beginning of the neighborhood.

Mr. Dynes quoted from the 'Comprehensive Plan regarding the preservation of landscaped green space:

> The landscaped green space on publicly owned, privately maintained front and side yards in historic districts and on historic landmarks should be preserved. Special care should be taken to protect these historic green areas from being paved over for vehicular access and parking.

In addition to his own testimony as a member of the Kalorama Citizens Association's Historic Committee, Mr. Dynes, who was a member of the HPRB when the Kalorama Triangle Historic District was approved for the National Register of Historic Places, read into the record a letter dated April 19, 2000, from the Historic Committee to the HPRB. The letter voiced opposition to the petitioners' proposed alterations on two grounds:

> One, introduction of a driveway would cause the loss of a significant section of the existing berm, which is an important feature in the continuity of [Belmont Road], as well as being an important unifying element in the Kalorama Triangle Historic District. Removal of a 7–foot width from the existing 14–foot–wide berm adjacent to the entry stair represents a 50 percent reduction and only leaves a 3–foot–wide planted area between the stair and the proposed driveway. This 3–foot–wide section is not wide enough to maintain the visual continuity of the berm.

> Number two, approval of this proposal would create an unwelcome precedent for other properties that have no alley access to seek the same remedy. We believe that the consequence of such a precedent would be negative for the integrity of the historic district, as there are numerous properties in this district that do not have alley access.

At the conclusion of Mr. Dynes' testimony, Mr. Gondelman took issue, asserting in part:

> Take a look at the view. This is the view down from, what Mr. Dynes was just talking about, down from 19th Street. This is the new development there. That's what you see on this side. Now, with all due respect, if you look down on the Belmont side, you can't see those berms. You are not going to be able to tell, from the bottom of 20th Street or the top of 19th Street, that there is a 7–foot cut in my berm. There's just no way you're going to be able to see that.

Mr. Gondelman also urged the HPRB not to say, "because precedent is a concern, nobody can get it. You can't do that."

At the conclusion of its hearing, seven of the eight HPRB Board members present voted to adopt the staff report and to recommend rejection of the petitioners' preliminary permit application. Approximately four months after the HPRB's action, the Mayor's Agent held a public hearing in response to the HPRB's recommendation. Ms. Eig, Mr. Carroll, Mr. Gondelman and others testified for the petitioners.

Ms. Eig described the petitioners' residential premises as "one of a group of seven in a row in a short block within the Kalorama Triangle that is on a fairly— similar grade." She stated that, "each house is similar, but different." One distinguishing feature of the petitioners' property "is a concrete porch that is canti-levered." Ms. Eig was not certain as to whether the porch was "structurally canti-levered" but said that, "it appears to be

cantilevered from the facade of the building with a wrought iron well on it. And has essentially the sense that there is a space underneath." When asked by Mr. Gondelman, whether "the 1900 block of Belmont Road present[s] any unique characteristics when compared to other blocks within the historic district," Ms. Eig replied:

> The thing that comes to mind, for instance, the stepped quality of it, because it is that grade, and because the group, the architect set them back from each other. And that probably is the single—if you had to have a single factor that makes them different.... That stands out dramatically.

The "stepped quality" is the same characteristic emphasized by Mr. Dynes during his testimony, in behalf of the Kalorama Citizens Association, during the HPRB's May 2000 public hearing.

Mr. Carroll explained the proposed alterations to the petitioners' property. He stated that out of eleven houses on the block, "[t]here are only two that would be eligible" for the type of alterations proposed by the petitioners, and only one would require a curb cut. He responded, "yes," when asked whether he believed that the proposed alterations would enhance the petitioners' property.

Mr. Gondelman testified that 150 persons living within the Kalorama Historic District had signed a petition indicating no opposition to the petitioners' proposed al-

terations. He stated that he "knew that fear of precedent would be a concern. So [he] hired ... Ms. Eig's firm to do a study...." In his view, "[t]he fear of [setting] preceden[t] in this case is vastly overstated," because of the cost of attempting alterations for a front parking pad.[3] Mr. Gondelman stressed that "[c]lose to 50 percent of the berm will be retained," and that a pergola would be erected over the proposed garage area.[4]

Two months after the September 2000 public hearing, the Mayor's Agent issued his findings of fact, conclusions of law and order, and a month later, a clarifying amended order. The Mayor's Agent summarized the conclusion of the HPRB. In presenting his own determination, the Mayor's Agent recognized that some of the other properties in the area had curb cuts, but declared that there is "a significant difference between these properties and the [a]pplicants' landlocked rowhouse, which sits much closer to the curb." Continuing, the Mayor's Agent declared:

> Part of the rationale for adopting the Act was to stem the tide towards the diminution of the landscape features of historic districts in the District of Columbia, which would include the imposing of strict controls, which disfavors installing landscape reducing curb cuts, driveway installations, and berm removals in historic districts, as well as to bring some order and consistency to the architecture of the historic district.

**3.** Without revealing "dollar figures," Mr. Gondelman cited the cost of hiring his architect, his lawyer, and his architectural historian as a dissuading factor for other neighbors.

**4.** During oral argument in this court, Mr. Gondelman emphasized alterations approved for a house located at 2007 Belmont Road, N.W. However, the Mayor's Agent pointed out that, "there is a substantial front yard [on that property], even though it doesn't appear to have been landscaped." Mr. Gondelman

agreed, but maintained that the alterations to the structure on that property were more extensive than those proposed by the petitioners. Earlier, Mr. Gondelman had asked Mr. Carroll whether the alteration at 2007 Belmont Road was "a more significant alteration to the structure than what [he] proposed with respect to [the petitioners'] house." Mr. Carroll responded, "I would say about the same significance." The Mayor's Agent commented that: "There is no driveway [on the property at 2007 Belmont Road]."

Once the Act and its enforcement became an integral part of legal enforcement in the District of Columbia, the fact that curb cuts and other related intrusions were made at a prior time, whether legally or illegally, cannot be used as a legal standard by which to evaluate this current [a]pplication, and authorize the granting of the relief sought.

The granting of this [a]pplication would not only eliminate at least one on-street parking space, but would also reduce the green space which is an integral part of the Kalorama Triangle Historic District, and very likely create an atmosphere in which multiple petitions for additional curb cuts, driveways, and on-site property parking will almost certainly follow, despite the applicants' self-effacing assertion that there appear to be no more than three (3) potential legally justifiable or sustainable additional petitions from among the other 24 landlocked homeowners in the historic district, due to zoning restrictions and other considerations as recited elsewhere in this record.

The *Comprehensive Plan for the National Capital,* adopted in 1985, recited in Sec. 807(16)(f), that: "The landscaped green space on publicly owned, privately maintained front and side yards in Historic Districts and on Historic Landmarks should be preserved. Special care should be taken to protect these historic green areas from being paved over for vehicular access and parking."

In addition, the Mayor's Agent rejected the petitioners' "enhancement" and "adaptation to the 21 st Century" arguments since "the applicants voluntarily elected to reside at the site, and thereby assumed the risk that future development might place some restriction or narrowing of the scope of their enjoyment."

## ANALYSIS

The petitioners contend that: "[T]he Mayor's Agent overrode the uncontested evidence presented to him and relied on several factors that have no place in the [historic preservation] statutory scheme, i.e. the Petitioner's voluntary election to purchase a home in 1986 with no parking, the fear of setting a precedent for other such applications, the incompatibility of the removal of a portion of the berm with the character of the historical district, and the language of the Comprehensive Plan." They argue that they presented unrefuted evidence that their proposed alterations would enhance their house and would be compatible with the character of the historic district. Generally, the respondent maintains that the decision of the Mayor's Agent is supported by substantial evidence in the record, and is in accordance with the Act. Specifically, the respondent argues that the petitioners' "proposed alteration is incompatible with the historic character of petitioners' home and the Kalorama historic district within which they reside."

 We summarized our standard of review for this type of case in *Reneau v. District of Columbia,* 676 A.2d 913 (D.C. 1996):

Our review of this matter is limited and narrow. "We must uphold the Mayor's Agent's decision if the findings of fact are supported by substantial evidence in the record considered as a whole and the conclusions of law flow rationally from these findings." *Kalorama Heights Ltd. P'ship v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 655 A.2d 865, 868 (D.C. 1995) (citing D.C.Code § 1–1510(a)(3)(E) (1992 Repl.), and *District of Columbia Pres* [.] *League v. Dep't of Consumer & Regulatory Affairs,* 646 A.2d 984, 989 (D.C.1994) (other citations omitted)). "Moreover, when … the Mayor's

Agent's [ ] decision is based on an 'interpretation of the statute and regulations it administers, that interpretation will be sustained unless shown to be unreasonable or in contravention of the language of the legislative history of the statute.' " *Kalorama Heights,* 655 A.2d at 868 (quoting *Nova Univ* [.] *v. Educational Inst. Licensure Comm'n,* 483 A.2d 1172, 1190 (D.C.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985)). Furthermore, "[i]n making the necessary findings, a Mayor's Agent is 'not required to explain why [he or she] favored one witness' testimony over another, or one statistic over another." *Id.* at 868–69 (quoting *Don't Tear It Down, Inc. v. Dep't of Hous* [.] *and* [*Cmty.*] *Dev.,* 428 A.2d 369, 378 (D.C.1981)). We have also said, however, that " 'some indication of the reason for rejecting expert, as opposed to lay, testimony is required.' " *Committee For Washington's Riverfront Parks v. Thompson,* 451 A.2d 1177, 1193 (D.C.1982) (quoting *Bakers Local Union No. 118 v. District of Columbia* [*Bd.*] *of Zoning Adjustment,* 437 A.2d 176, 179 n. 6 (D.C.1981)). *Id.* at 917 (textual alterations in original). After reviewing the record in this matter and the arguments of the parties, we are satisfied that the Mayor's Agent's findings are based upon substantial evidence in the record, and that his conclusions flow rationally from the findings. Although, as an original matter, we might or might not agree with the Mayor's Agent's interpretation of the Act, we cannot say that his interpretation is unreasonable, nor inconsistent with the language of the Act. Nor can we say that the findings and conclusions of the Mayor's Agent provide no

indication of his reason for not relying on the testimony of Ms. Eig, the architectural historian, that the petitioners' proposed alterations are compatible and consistent with the purposes of the Act.

We turn now to the applicable statutory provisions. Under § 6–1102(1) of the Act, " 'Alter' or 'alteration' means a change in the exterior appearance of a building or structure or its site, . . . ." Section 6–1105(f) specifies that: "No permit shall be issued unless the Mayor finds that such issuance is necessary in the public interest. . . ." "Necessary in the public interest" is defined in § 6–1102(10) to mean "consistent with the purposes of this subchapter as set forth in § 6–1101(b). . . ." Section 6–1101(b)(1) summarizes the purposes of the subchapter "[w]ith respect to properties in historic districts" as:

(A) To retain and enhance those properties which contribute to the character of the historic district and to encourage their adaptation for current use;

(B) To assure that alterations of existing structures are compatible with the character of the historic district; and

(C) To assure that new construction and subdivision of lots in an historic district are compatible with the character of the historic district[.]

In contrast to § 6–1107 concerning new construction, both § 6–1104 pertaining to demolitions, and § 6–1105 relating to alterations, set forth the same standards for the issuance of a permit, that it be "necessary in the public interest" or that "failure to issue the permit will result in unreasonable economic hardship to the owner."[5] Only the "necessary in the public interest" standard is relevant to the case before us,

---

5. Section 6–1107(f), involving new construction specifies that: "The permit shall be issued unless the Mayor ... finds that the design of the building and the character of the historic district or historic landmark are in-

compatible; . . . ." The same standard of incompatibility also applies to the erection of an additional building or structure where there is currently a building or structure on the property.

since the petitioners do not argue "economic hardship."

The Act defines the "necessary in the public interest" standard to mean "consistent with the purposes . . . set forth in § 6–1101(b)," that is, in relevant part, the retention and enhancement of "properties which contribute to the character of the historic district and [which] encourage their adaptation for current use," as well as the permitting of "alterations of existing structures [that] are compatible with the character of the historic district."

The petitioners rely on evidence, primarily the testimony of their architect, architectural historian, and one of the owners, maintaining that their proposed alterations adapt and enhance their house in a way that contributes to the character of the historic district, and urge that this evidence satisfies their burden under § 6–1101(b)(1)(A). Furthermore, they insist that § 6–1101(b)(1)(B) requires only a showing that the proposed alterations to their house alone, rather than the entire site of their home, "are compatible with the character of the historic district." They discount the Act's definition of "alteration" which means "a change in the exterior appearance of a building or structure *or its site.* . . ." D.C.Code § 6–1102(1) (emphasis added).

■ Before beginning our examination of the parties' arguments, we set forth statutory interpretation principles that guide our analysis. "[W]e construe statutory provisions 'not in isolation, but together with other related provisions.'" *Olden v. United States,* 781 A.2d 740, 743 (D.C. 2001) (quoting *Carey v. Crane Serv. Co.,* 457 A.2d 1102, 1108 (D.C.1983)). "While statutory words are to be accorded their ordinary meaning absent indication of a contrary legislative intent[,] . . . statutory meaning is of course to be derived, not from the reading of a single sentence or section, but from consideration of an entire

enactment against the backdrop of its policies and objectives." *Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.,* 206 U.S.App.D.C. 122, 128, 642 F.2d 527, 533 (D.C.1980) (footnotes and citations omitted). Thus, "[i]n construing [ ] two subsections . . . , we must at the same time give effect to the whole statute in light of its underlying objectives." *Baghini v. District of Columbia Dep't of Employment Servs.,* 525 A.2d 1027, 1029 (D.C.1987) (citing, *inter alia, Carey, supra,* 457 A.2d at 1105).

■ In applying these statutory interpretation principles to this case, we are mindful that we give deference to the expertise of an agency, as well as its interpretation of its governing statute, unless that interpretation is unreasonable or inconsistent with the language of the statute, *see Reneau, supra,* 676 A.2d at 917. Here, we are satisfied that the Mayor's Agent's decision gives effect to the entire Act in light of its policies and objectives, and that concentration on a single provision, in isolation as the petitioners would have us do, is inappropriate. *See Olden; Pennsylvania Ave. Dev. Corp.* and *Baghini, supra.*

The petitioners' burden under § 6–1105(f) is a heavy one. They must demonstrate that the issuance of a preliminary permit for their proposed alterations is "necessary in the public interest." To demonstrate necessity in the public interest, they must meet two statutory requirements. First, under § 6–1101(b)(1)(A), they must establish that their proposed alterations "retain and enhance . . . [historic] properties [in a manner] which contribute[s] to the character of the historic district *and* [which] encourage[s] the[ ] adaptation [of historic properties] for current use." *Id.* (emphasis added). Under this subsection it is insufficient to emphasize only enhancement to adapt a property for current use. Rather, the applicant must

also demonstrate that the proposed alterations will retain and enhance the historic property so that it contributes to the character of the historical district.

■ Second, under § 6–1101(b)(1)(B), they must demonstrate that their proposed "alterations of [the] existing structure[ ] are compatible with the character of the historic district." With respect to this requirement, the Mayor's Agent was not limited solely to a consideration of proposed changes to the structure, the petitioners' house. Rather, given the definition of "alterations" set forth in § 6–1102(1), the Mayor's Agent and the HPRB are authorized to consider the entire site on which the structure sits, that is, the petitioners' house as well as the land, including the berm.[6] At the HPRB's hearing, counsel for the petitioners told the HPRB: "Your authority on alterations is directed at the site and the exterior of historic landmarks, or the building or structure of a compatible building in a historic district, and not the site of the building within the historic district." In fact, under the plain meaning of the entire statutory scheme at issue here, the Mayor's Agent's and the HPRB's authority extends to the site and the structure which are the subject of the preliminary permit application, as well as to the question of whether the proposed alterations are "compatible with the character of the historic district." § 6–1101(b)(1)(B).

■ Therefore, in determining and interpreting its authority under § 6–1101(b), it was neither unreasonable nor legal error for the Mayor's Agent and the HPRB to reference the section of the District's Comprehensive Plan which mandates that "landscaped green space on publicly owned, privately maintained front and side yards in historic districts and on historic landmarks should be preserved," because that section reflects, in part, the policies and objectives of the District's historic preservation law.[7] We have previously said that District agencies may "look to the ... elements [of the Comprehensive Plan] for general policy guidance...." *National Cathedral Neighborhood Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 753 A.2d 984, 987 (D.C.2000) (second alteration in the original) (citing 10 DCMR § 112). Similarly, it was neither unreasonable nor legal error for the Mayor's Agent to reference and decide this case in the context of the rationale for the historic preservation law; as the Mayor's Agent declared:

> Part of the rationale for adopting the Act was to stem the tide towards the diminution of the landscape features of historic districts in the District of Columbia, which would include the imposing of strict controls, which disfavors installing landscape reducing curb cuts, driveway installations, and berm remov-

**6.** *See also* § 6–1105(a) ("Before the Mayor may issue a permit to alter the exterior or site of ... a building or structure in an historic district, the Mayor shall review the permit application in accordance with this section....").

**7.** The Comprehensive Plan Amendment Act of 1999, 46 D.C.Reg. 1441 (1999) includes Chapter 8, which contains policies governing preservation of historic properties and districts. Section 805.6 specifies:

> The landscaped green space on publicly owned, privately maintained front and side yards in historic districts and on historic

landmarks should be preserved. Special care should be taken to protect these historic green areas from being paved over for vehicular access and parking.

Chapter 12 of the document sets forth the Ward 1 plan; Ward 1 encompasses the Kalorama Triangle Historic District. Section 1225 of the Ward 1 plan sets forth objectives for preservation and historic features of the area. Section 1225.1 reads: "The objectives for preservation and historic features are to preserve the important historic features of Ward 1 while permitting new development that is compatible with those features."

als in historic districts, as well as to bring some order and consistency to the architecture of the historic district.

Nor was it unreasonable for the HPRB to consider the history of that district, including the construction of homes without garages due to the availability of public transportation; nor to take into account possible future similar requests for permits to construct parking under residences which would eliminate or decrease other berms, or the "stepped quality" of the 1900 block of Belmont Road. *See Foster v. Mayor's Agent for Historic Pres.*, 698 A.2d 411, 412 (D.C.1997) (affirming the conclusion of the Mayor's Agent that the "permanent installation of [a particular structure] on public space [would be] inconsistent with preserving the sightliness and historic integrity of districts covered by the Act...."); *Daro Realty, Inc. v. District of Columbia Zoning Comm'n*, 581 A.2d 295, 302 (D.C.1990) (reliance upon the Comprehensive Plan to review the Zoning Commission and the HPRB's analysis under the Act).

■ Given the HPRB staff report, the recommendation of the HPRB to the Mayor's Agent, the Mayor's Agent's analysis, the testimony of Mr. Dynes before the HPRB, and the letter from the Historic Committee of the Kalorama Citizens Association, entities regarded as having expertise in the area of historic preservation and historic districts in Washington, D.C., we conclude that there is substantial evidence in the record on review to support the Mayor's Agent's decision. In addition, the record reveals some indication as to why the Mayor's Agent did not rely upon Ms. Eig's testimony, or that of Mr. Carroll, relating to "the other 24 landlocked home-

owners in the historic district ...." who could or might file "legally justifiable or sustainable additional petitions...." He characterized this testimony as "applicant's self-effacing assertion." Moreover, even Ms. Eig, in response to a question from Mr. Gondelman, acknowledged that one unique characteristic of the 1900 block of Belmont Road, N.W. is, "the stepped quality of it...." The Mayor's Agent found that the "stepped quality" would be severely impacted by the applicants' proposed alterations and could serve as a precedent for other front parking pads that would reduce green space through berm removals. In short, the rationale and interpretation of the Act that is reflected in the Mayor's Agent's decision is neither unreasonable nor inconsistent with the Act; hence, we owe deference to the agency's interpretation *See Reneau, supra,* 676 A.2d at 917 ("Although the decision is not a model of clarity, a close reading reveals that it contains a cogent analysis of the record evidence, flows rationally from the findings of fact, and contains no erroneous interpretations of law.").[8]

Accordingly, for the foregoing reasons, we affirm the decision of the agency.

---

8. The fact that the Mayor's Agent refers to § 6–1101(a)(1) is not fatal, since that section refers to "distinctive elements of the city's ... architectural history" and is akin to "the character of the historic district" referenced in § 6–1101(b)(1)(A) and (B). "[W]e construe statutory provisions 'not in isolation, but together with other related provisions.'" *Olden, supra,* 781 A.2d at 743 (quoting *Carey, supra,* 457 A.2d at 1108).