Jacques ABADIE III, et al., Petitioners,

v.

**DISTRICT OF COLUMBIA CONTRACT APPEALS BOARD, Respondent.**

**BUSINESS SOFTWARE ASSOCIATES, INC., Intervenor.**

No. 01–AA–355.

District of Columbia Court of Appeals.

Argued May 14, 2002.

Decided March 4, 2004.

Edward E. Schwab, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, were on the brief, for petitioners.[1]

Jonathan D. Shaffer, with whom John S. Pachter was on the brief, Vienna, VA, for intervenor.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

REID, Associate Judge:

The issue in this case is whether this court has jurisdiction to consider this challenge to the authority of the Contract Appeals Board ("the CAB") to hear and resolve a dispute pertaining to the termination of a contract with Business Software Associates, Inc. ("BSA") by the Office of the Chief Financial Officer for the District of Columbia ("OCFO"). We conclude that this court has jurisdiction, and that the CAB has authority over the contract dispute between BSA and the OCFO.

## FACTUAL SUMMARY

On February 11, 2000, the OCFO awarded a contract to BSA. The contract pertained to a conversion by the District of Columbia government from the Unified Personnel Payroll System ("UPPS") to the Comprehensive Automated Personnel Payroll System ("CAPPS"). Subsequently, several bilateral modifications were made to the contract. The OCFO terminated BSA's contract on August 21, 2000. The stated reason for the termination was "default." Two months later, BSA filed a complaint with the CAB seeking to convert the default termination to a "termination for convenience."[2]

The OCFO moved to dismiss BSA's complaint, arguing that the CAB had no jurisdiction over the matter. On December 13, 2000, after an oral hearing on November 20, 2000, before Administrative Judge Matthew S. Watson, the CAB disagreed with the OCFO's position that it was exempt from the application of the District

---

1. The Corporation Counsel decided to represent petitioners rather than the Contract Appeals Board, and the Contract Appeals Board did not file a brief; however, the intervenor supports the Contract Appeals Board's position in this matter. *See Francis v. Recycling Solutions, Inc.*, 695 A.2d 63, 93–94 (D.C. 1997).

2. The contract contained two termination provisions—"termination for default," essentially for failure to deliver supplies or to perform tasks or to make progress as required by the contract; and "termination for convenience," that is, a termination "in the District's interest."

of Columbia Procurement Practices Act ("PPA") with respect to matters of contract administration. Hence, it denied OCFO's motion to dismiss BSA's complaint, declaring in part:

The [CAB] concludes that by mandating the adoption of specific and clearly limited procurement regulations dealing only with contract formation as an apparent condition for OCFO's exemption from provisions of the [PPA], the Council [of the District of Columbia] defined and limited the exemption to disputes covered by the mandated regulations. Since the mandated regulations do not in any way concern a determination by the contracting officer of a default under a contract or resolution of a dispute concerning such a determination, the Council cannot be deemed to have exempted the [OCFO] from applicable provisions of the PPA or the jurisdiction of [the CAB].

Jacques Abadie III, then Interim Chief Procurement Officer for the District, filed a petition for review in this court on behalf of himself, the CFO of the District, and the District, and moved for summary reversal of the CAB's decision. The motion was denied, and the court ordered the parties to show cause why the petition should not be dismissed for lack of jurisdiction. A motions division of this court ultimately decided to refer the jurisdictional matter to the merits panel.

## ANALYSIS

The sole issue before us is whether this court has jurisdiction to determine whether the CAB was correct in asserting jurisdiction over the BSA complaint, even though it involved the OCFO, an office created by the Congress of the United States in its enactment of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 ("the Control Board Act"). *See* Pub.L. 104–8, 109 Stat. 97, 98 (1995). The OCFO was

accorded substantial autonomy under the Control Board Act. Our resolution of this issue requires us to interpret several statutory provisions, including those relating to the District of Columbia Administrative Procedures Act ("the APA"), the CAB, the OCFO, and the PPA. Thus, we are confronted with a legal issue which we review *de novo. See Belcon, Inc. v. District of Columbia Water & Sewer Auth.,* 826 A.2d 380, 384 (D.C.2003); *In re Estate of Green,* 816 A.2d 14, 16 (D.C.2003).

 Given its expertise, "we give careful consideration to [the CAB's] interpretation [of its governing statute] because legal interpretations by tribunals having expertise are helpful even if not compelling." *See Abadie v. Organization for Envtl. Growth, Inc.,* 806 A.2d 1225, 1227 (D.C.2002) (citations and internal quotation marks omitted). "We therefore accord 'great weight' to the [CAB's] construction of a government contract, so long as that construction is not unreasonable." *Belcon, Inc., supra,* 826 A.2d at 384 (citing *Dano Res. Recovery, Inc. v. District of Columbia,* 620 A.2d 1346, 1352 (D.C.1993)). "The last word [concerning the meaning of the applicable statute], however, is the court's, for "the judiciary is the final authority on issues of statutory construction." *Id.* (citation omitted). On legal questions, then, the CAB's ruling is neither "final [n]or conclusive." *Organization for Envtl. Growth, Inc., supra,* 806 A.2d at 1227.

 There are several general principles of statutory interpretation that guide our analysis in this case. We reiterated these principles in *Boyle v. Giral,* 820 A.2d 561, (D.C.2003):

We look to the plain meaning of the statute first, construing words according to their ordinary meaning. *See J. Parreco & Son v. Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989). "The literal words of [a] statute, however, 'are not the sole index to legislative intent,' but

rather, are 'to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice." *District of Columbia v. Gallagher,* 734 A.2d 1087, 1091 (D.C.1999) (quoting *Metzler v. Edwards,* 53 A.2d 42, 44 (D.C.1947) (footnotes omitted)). Furthermore, " 'if divers statutes relate to the same thing, they ought to be taken into consideration in construing any one of them .... ' "*Luck v. District of Columbia,* 617 A.2d 509, 514 (D.C.1992) (quoting *United States v. Freeman,* 44 U.S. (3 How.) 556, 564–65, 11 L.Ed. 724 (other citations omitted)). If related statutes conflict, we must reconcile them. *See Gonzalez v. United States,* 498 A.2d 1172, 1174 (D.C.1985).

*Id.* at 568; *see also Gondelman v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 789 A.2d 1238, 1245 (D.C. 2002). In appropriate cases, we also consult the legislative history of a statute. *See Kelly v. District of Columbia,* 765 A.2d 976, 978 (D.C.2001). We said in *Carter v. State Farm Mut. Auto. Ins. Co.,* 808 A.2d 466 (D.C.2002), "a court may refuse to adhere strictly to the plain wording of a statute in order to effectuate the legislative purpose, as determined by a reading of the legislative history or by an examination of the statute as a whole." *Id.* at 471 (quoting *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C. 1983)).

Having set forth the guiding principles of statutory interpretation, we turn first to the applicable provision of the APA, D.C.Code § 2–510(a) (2001).[3] That provision specifies in pertinent part:

Any person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case, is entitled to a judicial review thereof in accordance with this subchapter upon filing in the District of Columbia Court of Appeals a written petition for review. If the jurisdiction of the Mayor or an agency is challenged at any time in any proceeding and the Mayor or the agency, as the case may be, takes jurisdiction, the person challenging jurisdiction shall be entitled to an immediate judicial review of that action, unless the Court shall otherwise hold.

Here, contrary to the position of the OCFO, the CAB declared that it had jurisdiction over the challenge to the OCFO's termination of BSA's contract for default rather than for the convenience of the government. The CAB took jurisdiction in the face of the OCFO's challenge to its jurisdiction. Under the plain language of § 2–510(a) "the person challenging jurisdiction [here Mr. Abadie, OCFO and the District] shall be entitled to an immediate judicial review of that action, unless the Court shall otherwise hold." We construed and explained the clause, "unless the court shall otherwise hold," in *Bender v. District of Columbia Dep't of Employment Servs.,* 562 A.2d 1205, 1207 (D.C. 1989). For the court to take the matter immediately "a party must be able to show that the agency action is plainly in excess of its delegated powers; the error must involve more than a mere error of fact or law, there must be action in the absence of statutory authority." *Id.* at 1209 (citations omitted). We went on to "hold that the challenged agency action must be in clear excess or plain contravention of its statutory mandate before this court may assert jurisdiction under [§ 2–510(a)] to review such action prior to the party's exhaustion of administrative remedies." *Id.* at 1210; *see also District of Columbia v. Greene,* 806 A.2d 216, 219 (D.C.2002) (citing *Bender, supra,* 562 A.2d at 1209) ("[W]e ... determine that [petitioner's] petition for

---

**3.** Section 2–510(a) was codified previously at D.C.Code § 1–1510(a) (1999).

review of the CAB's interlocutory decision asserting jurisdiction is premature as it is not 'plainly in excess of its delegated powers.' ").

 Thus, under *Bender, supra,* we have jurisdiction at least to decide whether the CAB acted "plainly in excess of its delegated powers." That inquiry requires that we examine divers statutes, reading them "as a whole" and "giv[ing] them a sensible construction." *Boyle, supra,* 820 A.2d at 568. We begin with D.C.Code § 309.03,[4] the CAB's jurisdictional statute which provides in relevant part:

> (a) The [CAB] shall be the exclusive hearing tribunal for, and shall have jurisdiction to review and determine de novo:
>
> . . . .
>
> (2) Any appeal by a contractor from a final decision by the contracting officer on a claim by a contractor, when such claim arises under or relates to a contract; and
>
> (3) Any claim by the District against a contractor, when such claim arises under or relates to a contract.

Subsection (b) of § 2–309.03 also contains pertinent language:

> (b) Jurisdiction of the [CAB] shall be consistent with the coverage of this chapter as defined in §§ 2–301.04 and 2–303.20, except that the Board shall have the authority to enter into fee-for-service agreements with agencies, departments, boards, commissions, and instrumentalities of the District or other public entities that are not subject to the [CAB's] jurisdiction. The agreements shall provide for the [CAB] to resolve contract disputes, including appeals and protests of those agencies, departments, boards, commissions, and instrumentalities.

These statutory provisions plainly specify that the CAB has jurisdiction to hear a contractor's appeal from a contracting officer's final decision, including appeals involving contract disputes. The question therefore arises as to whether any other statutory provision limits or takes away that jurisdiction generally, or under special circumstances.

Since BSA's contract resulted from a procurement action by the OCFO, we turn to the PPA to determine whether it exempts the OCFO's procurement processes from its coverage in this matter. Section 2–301.04(a)[5] lists the agencies to which the Procurement Practices Act shall apply:

> (a) Except as provided in § 2–303.20, this chapter shall apply to all departments, agencies, instrumentalities, and employees of the District government, including agencies which are subordinate to the Mayor, independent agencies, boards, and commissions, but excluding the Council of the District of Columbia, District of Columbia courts, and the District of Columbia Financial Responsibility and Management Assistance Authority, and District of Columbia Advisory Neighborhood Commissions.

Notably, this section neither explicitly nor implicitly excludes the OCFO from its reach, although it expressly does not apply to the Control Board. Moreover, independent agencies and agencies subordinate to the Mayor that have not been named in the exclusion clause are covered by the PPA. The exception clause does not support the OCFO's argument because D.C.Code §§ 2–303.20(a) through (m)[6]

---

4. Previously codified at D.C.Code § 1–1189.3(b) (1999).

5. Previously codified at D.C.Code § 1–1181.4(a) (1999).

6. Previously codified at D.C.Code § 1–1183.20 (1999).

contain no exemption for the OCFO. The entities granted exemptions are: the Redevelopment Land Agency for "real property or interests in real property"; the Administrator of the Homestead Program Administration for "the disposal or transfer of real property"; the Mayor as it pertains to the sale of "real property in the District of Columbia for the nonpayment of taxes or assessments of any kind pursuant to § 47–847"; the Mayor and the Council concerning the assessment of rent under part A, subchapter 1 of chapter 11 of title 10 of the D.C.Code; the Convention Center, the Sports Commission, the Housing Finance Agency, and the Retirement Board respecting certain of their authorities; the Metropolitan Police Department for "procurements not in excess of $500,000"; the Water and Sewer Authority's procurement and contract systems; the Health and Hospitals Public Benefit Corporation; the Public Service Commission; and the Housing Authority for some of its work. Under the *expressio unius est exclusio alterius* linguistic canon of interpretation, the absence of any mention of the OCFO in § 2–301.4(a) and §§ 2–303.20(a) through (m) is significant, although not necessarily controlling. *See Shook v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 328 U.S.App. D.C. 74, 81, 132 F.3d 775, 782 (1998) ("the ancient maxim of statutory interpretation *expressio unius est exclusio alterius*, 'the mention of one thing implies the exclusion of another,' .... is often misused.")) (citations omitted).

D.C.Code § 2–301.04 has two other subsections which require our attention before we draw a final conclusion regarding this matter. Section 2–301.04(b) provides: "This chapter shall apply to any contract for procurement of goods and services, including construction and legal services, but shall not apply to a contract or agreement receiving or making grants-in-aid or for federal financial assistance." Clearly, BSA's contract with the OCFO is not one concerning "receiving or making grants-in-aid," nor is it one for "federal financial assistance." It is, however, a "contract for procurement of goods and services."[7]

Examined alone, subsections (a) and (b) of § 2–301.04 neither appear to present any impediment to the CAB's jurisdiction, nor indicate that taking jurisdiction over the OCFO/BSA contract dispute would be plainly in excess of its delegated powers. BSA's contract is one "for procurement of goods and services" that is not exempted from the PPA, and hence, "a contractor, [here BSA], may appeal the [termination] decision [of the OCFO] to the [CAB]." D.C.Code § 2–309.04(a).[8] But, the OCFO and the District urge us to find a bar to the CAB's jurisdiction in the definition of "a control year," a term set forth in subsection (c) of § 2–301.04[9] of the PPA which states:

> The Council of the District of Columbia, the Corporation Counsel, Inspector General, Auditor, and Chief Financial Officer may contract for the services of accountants, lawyers, and other experts when they determine and state in writ-

---

**7.** BSA's contract required it to "complete the baseline implementation" of the CAPPS through (1) a "roll-out of District agencies" which involved such tasks as running payroll cycles, implementing system backups and developing recovery procedures; (2) "upgrading the current version of CAPPS"; (3) "provid[ing] development support to CAPPS"; (4) "provid[ing] a complete design document listing all changes and modifications from stan-

dard Integral package to current modified CAPPS"; and (5) "deliver[y] of a Technical Training Plan."

**8.** Previously codified at D.C.Code § 1–1189.4(a) (1999).

**9.** Previously codified at D.C.Code § 1–1181.4(a) (1999).

ing that good reason exists why such services should be procured independently of the CPO. During a control year, as defined by § 47–393(4), the [OCFO] shall be exempt from the provisions of this chapter, and shall adopt, within 30 days of April 12, 1997, the procurement rules and regulations adopted by [the Control Board]. During years other than control years, the [OCFO] shall be bound by the provisions contained in [the PPA].

Section 47–393(4) [10] specifies: "The term 'control year' means any fiscal year for which a financial plan and budget approved by the [Control Board] under § 47–392.02(b) is in effect, and includes Fiscal Year 1996."

▉ The "control" period did not expire until February 14, 2001, when the Control Board ceased to exercise authority, and thus, BSA's contract which was awarded on February 11, 2000, and terminated on August 21, 2000, fell within the period that the Control Board had authority within the District. The question remains, however, whether § 2–301.04(c) applies to BSA's contract. The answer depends on our interpretation of this subsection, " 'not in isolation, but together with other related provisions.' " [11] *Gondelman, supra,* 789 A.2d at 1245 (quoting *Olden v. United States,* 781 A.2d 740, 743 (D.C.2001) (quoting *Carey v. Crane Serv. Co.,* 457 A.2d 1102, 1108 (D.C.1983))). Notably, the language in subsection (c) pertaining to "a control year" is preceded by a delineation of the types of contracting services covered by this subsection. The types of OCFO contracts which are

singled out are those "for the services of accountants, lawyers and other experts." This categorization suggests professional contracts pertaining to services rendered by individuals who are experts or consultants. These types of professional services contracts differ from procurements, such as BSA's, relating to the design, conversion or establishment and operation of systems like the CAPPS. Support for this interpretation is found in the pertinent legislative history of subsection (c) of § 2–301.04 which states:

> This provision allows the Council, Corporation Counsel, Inspector General, Auditor and the CFO, to contract for certain professional services independently of the PPA "when they determine and state in writing that good reason exists why such services should be procured independently of the Director." The legislation contemplates that the latter exception will only be used when [the Department of Administrative Services] could compromise an investigation. An example of this would occur in the case of a contract to secure services to investigate [the Department of Administrative Services]. That type of contract should not be reviewed by [the Department of Administrative Services] because of the potential conflict of interest.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS. COMMITTEE REPORT ON BILL 11–705, THE PROCUREMENT REFORM AMENDMENT ACT OF 1996, September 24, 1996 ("Coun-

---

**10.** Previously codified at D.C.Code § 47–393(4) (1997).

**11.** Unlike the CAB, through Administrative Judge Watson, we interpret the language and applicable legislative history of the statute directly, rather than focusing on the regulations adopted by the OCFO under § 2–301.04(c).

The words of the statute must control rather than the regulations, which must conform to the underlying statute. Judge Watson concluded that the CAB had jurisdiction because the regulations adopted by the OCFO covered only contract formation, not contract administration, and BSA's dispute with the OCFO pertained to contract administration.

cil Report"), at 3. In light of this legislative history, it is obvious that the District's legislature intended only a very limited exception for the OCFO with respect to its contracts—those involving professional services that, for example, could compromise an investigation, or constitute a conflict of interest for the Department of Administrative Services (the Department through which contracts normally flow) if that Department is under investigation. That is not the case with respect to BSA's contract. Hence, subsection (c) offers no support for the OCFO's argument against the CAB's jurisdiction. Indeed, the grant of only a very limited exception to the OCFO is consistent with the decision of the Council not to grant the OCFO an exemption in subsection (a) of § 2–301.04 or § 2–303.20. It is also quite consistent with the Council's pressing concern in enacting the 1996 amendments to the PPA, that is, the striking and unacceptable disarray of the District's contracting system. The Council Report points out that:

> On May 18, 1996, the Committee on Government Operations held a public oversight roundtable on the procurement system of the District government. The common conclusion from the overwhelming majority of the witnesses was that the city's system of procuring goods and services was in a state of chaos. There was widespread waste, fraud and abuse, no clear line of authority, cronyism, a severe lack of training and professionalism among contracting officers, and too many District employees with contracting authority, among other ills. Many of these flaws had been highlighted in several unheeded reports by the D.C. Auditor and Inspector General.

Council Report at 2. Consistent with its concern over gross irregularities and persistent flaws in the contracting system leading to waste, fraud and abuse, the Council decided to exclude only a very limited category of entities from the PPA, including the Control Board, the District of Columbia Courts, and the Advisory Neighborhood Commissions, and to include under the PPA even those that enjoy independent status. It also permitted a specified list of high ranking District officers a very limited exemption from the PPA, including the Inspector General, the Auditor, and the OCFO.[12] In sum, our reading of pertinent statutory provisions convinces us that the CAB did not exceed its powers in exercising jurisdiction over the contract dispute between BSA and the OCFO.

For the foregoing reasons, we sustain the jurisdiction of the CAB.

*So ordered.*

---

**12.** We need not determine here why the Council of the District of Columbia both exempted itself generally from the PPA in subsection (a) of § 2–301.04 and in a limited way in subsection (c).