*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 10-CV-78

BANK OF AMERICA, N.A., *et al.*, APPELLANTS,

v.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CAB-7763-08)

(Hon. Joan Zeldon, Motions Judge)[*]
(Hon. Frank Burgess, Motions Judge)[**]

(Argued October 19, 2011                    Decided November 27, 2013)

*Ava E. Lias-Booker*, with whom *Samantha Thompson*, *Brian A. Kahn*, *Adrienne J. Lawrence*, and *Michelle N. Lipkowitz*, were on the brief, for appellants.

*Stacy L. Anderson*, Assistant Attorney General, with whom *Irvin B. Nathan*, Acting Attorney General for the District of Columbia at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*, and WAGNER, *Senior Judge*.

---

[*] Judge Zeldon decided the Motion to Compel Arbitration.

[**] Judge Burgess decided the Motion to Stay.

WAGNER, *Senior Judge*: Appellants, Bank of America, N.A. and Bank of America Corporation (hereinafter collectively referred to as Bank of America or the Bank), appeal from an order of the trial court denying the Bank's motion to compel arbitration under the Federal Arbitration Act (FAA) of the District of Columbia's claims for damages for losses incurred as the result of a protracted fraudulent scheme perpetrated by the District's employees and allegedly facilitated by Bank of America. Bank of America argues that the trial court erred in its ruling because all of the District's claims are within the scope of a contractual agreement that requires arbitration in the state of North Carolina. The District's position is that there was no valid arbitration agreement, or alternatively, its claims do not fall within the scope of any agreement between the parties. We affirm the decision of the trial court holding that the parties had no valid agreement to arbitrate their dispute in North Carolina or elsewhere and retaining jurisdiction of the District's claim under the Fraud Claims Act. We remand the case to the trial court for further proceedings consistent with this opinion as it relates to the remaining counts of the District's amended complaint.

## I. Procedural Background

This action arises out of a fraudulent scheme by a former manager in the

District's Real Property Tax Administration Adjustment Unit in its Office of Tax and Revenue. The District filed a complaint against Bank of America, Walter R. Jones, Jr., Harriette Walters, Jayrece Elaine Turnbull, and unknown Jane and John Does alleging that they participated in a conspiracy that utilized a Controlled Disbursement Account (CDA or CD Account) that the District maintained with Bank of America to process fraudulent tax refund checks. Specifically, the District alleged that Walters, a former District employee, used her knowledge of the District's property tax refund process to prepare and ensure approval of the fraudulent checks which were given to co-conspirators to deposit or cash through the Bank. According to the complaint, Jones, an assistant branch manager for the Bank, and other unknown bank personnel facilitated the negotiation of the fraudulent checks. As theories of liability, the District asserted: (1) violation of the Uniform Commercial Code (UCC) (D.C. Code § 28:3-404 (2001)); (2) violation of UCC § 28:3-405; (3) negligence; (4) fraud; (5) breach of fiduciary duty; (6) conversion; (7) violation of the D.C. False Claims Act (FCA) (D.C. Code § 2-308.14 (2006 Repl.));[1] and (8) negligence in training, hiring and supervising bank personnel. As relief, the District sought repayment of all funds lost totaling $39,212,815.24. Under the False Claims Act, it sought treble damages of $117,212,815.24, penalties of $10,000 plus costs and attorney's fees.

---

[1] This provision has been recodified at D.C. Code § 2-381.02.

The Bank filed a "Motion to Dismiss, or in the Alternative, Stay Based on Forum Selection and Arbitration Clauses," which the trial court treated as a Motion to Compel Arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. In its motion, the Bank asserted that the District's claims are subject to arbitration pursuant to a clause in its Treasury Service Booklet (TSB) requiring arbitration of disputes related to the account or bank services and a forum selection clause in its Deposit Agreement (DA) requiring any proceeding regarding the CD Account to be brought in North Carolina. Concluding that the parties' voluminous filings did not make clear what documents controlled the dispute, the trial court held an evidentiary hearing in order to ascertain whether they had an agreement to arbitrate in North Carolina. Following completion of the hearing proceedings, the trial court denied the Bank's motion by written order in which it found that the parties' 2005 contract provisions superseded any dispute resolution or forum selection clauses previously agreed upon and that the signatories to any documents executed subsequently lacked authority to bind the District to arbitration in North Carolina. The court retained jurisdiction of the False Claims Act count explaining that the FCA is a part of the Procurement Practices Act of 1985 (PPA), which the parties incorporated into their 2005 agreement, and that actions thereunder are within the Superior Court's exclusive

jurisdiction under D.C. Code § 2-301 *et seq.*[2] The court dismissed the District's remaining claims, holding that they are within the exclusive jurisdiction of the District's own contracting officer and the Contract Appeals Board (CAB).

The Bank filed a motion to alter or amend the trial court's order and to certify certain rulings to this court for review. The Bank noted this appeal before the trial court (J. Zeldon) denied the motion to alter or amend. The trial court (J. Burgess) granted the Bank's motion to stay the proceedings on the FCA claim and stayed the dismissal of the District's remaining counts. However, the order permitted the District to pursue its contract claims before the District's Contracting Officer.

The Bank filed in this court a Motion to Stay Proceedings, or in the Alternative Enjoin the District Pending Appeal, in which it requested a stay or injunction to prevent the District from initiating proceedings before a contracting officer during the pendency of this appeal. This court denied that motion and ordered the Bank to show cause why the appeal should not be dismissed for lack of jurisdiction as having been taken from a non-final order, citing *In re Calomiris*, 894 A.2d 408, 408 (D.C. 2006),

---

[2] The Procurement Practices Reform Act of 2010 which came into effect April 8, 2011, repealed these provisions. *See* D.C. Law 18-371, § 1201 (a), 58 D.C. Reg. 1185 (Apr. 8, 2011).

*Hercules & Co. v. Beltway Carpet Serv., Inc.*, 592 A.2d 1069, 1071 n.6 (D.C. 1991), and D.C. Code § 11-721 (d) (2001).  Without resolving the jurisdictional question, this court issued an order vacating the Show Cause order, stating that "[t]he Supreme Court's decision in *Andersen LLP v. Carlisle*, 129 S. Ct. 1896 (2009) may [a]ffect the applicability of *Calomiris*, 894 A.2d at 410."  In that order, this court set a briefing schedule and requested the parties to discuss the opinion in *Carlisle* in their briefs. For the reasons set forth in part III A., *infra*, we conclude that this court has jurisdiction of the appeal.

## II.  Factual Background and Trial Court's Decision

### A.  *Factual Summary*

Before addressing the issues, we outline in some detail the factual background essential to an understanding of the parties' arguments and our disposition.  At least since the 1990s, the District has maintained a Controlled Disbursement Account with Bank of America or its predecessors.[3]  In July 1999, after Bank of America merged

---

[3]  "A CDA is a specialized business service for deposit accounts through which the District of Columbia is notified, at a specific time each business day, of the
(continued...)

with its most recent predecessor, Nations Bank, the account was maintained in North Carolina. On January 6, 2000, Valerie Holt, then Chief Financial Officer (CFO) for the District, executed a "Certified Copy of Corporate Resolutions — Opening and Maintaining Deposit Accounts and Services," which designated the CFO, the Deputy CFO/Treasurer, and the Associate Treasurer as persons authorized "to execute and sign any application, deposit agreement, signature card and any other documentation required by the Bank to open said accounts."[4] That same day, CFO Holt signed a signature card for the CDA and verified the signatures of three others to act under the

---

[3] (...continued)
number and amount of all District-issued checks that will be presented for payment that day. . . . The service allows the District to transfer to its CDA the exact amount of money necessary to cover the checks presented and to allow idle funds to be invested elsewhere."

[4] The Corporate Resolution also authorized the named individuals to do the following:

> to enter any agreements with the Bank for the provision by the Bank of various Treasury Management services to [the District of Columbia] as such officer or employee may determine, in his or her sole discretion, and to sign any and all documents and take all actions required by the Bank relative to such Treasury Management services . . . and that any such Treasury Management agreement(s) shall remain in full force and effect until written notice to terminate given in accordance with the terms of any such agreement shall have been received by the bank. . . .

Corporate Resolution.[5] The signature card states that by signing, the signatory agrees that the account is to be governed by the terms and conditions set forth in the Bank's Deposit and Disclosures Agreement (Deposit Agreement), including any amendments. The trial court found that all relevant Deposit Agreements specify North Carolina as the location for resolution of disputes and give the Bank the right unilaterally to amend its own Deposit Agreement. According to evidence at the hearing, completion of a signature card was required to add signatories to the account. Between 2000 and November 13, 2005, a number of District officials signed signature cards to add or remove names from the account. These included CFO Dr. Natwar Gandhi, successor to CFO Holt, Associate Treasurer Lasana Mack, and Interim Associate Treasurer Alcindor Rosier. One of the signature cards signed by Dr. Gandhi stated that by signing, he "agree[d] . . . [t]o be governed by the terms and conditions" set forth in the Deposit Agreement. Dr. Gandhi, Mr. Mack, and Mr. Rosier testified that they signed signature cards only to open an account or to add or remove signatories.

On September 25, 2000, Acting Deputy CFO/Treasurer, John Robinson, and

---

[5] In addition the CFO Holt, Dr. William Hall, Deputy CFO and Treasurer, and two Associate Treasurers were identified as persons authorized to act under the Corporate Resolution.

Interim Associate Treasurer and Bank Manager, Alcindor Rosier, executed an "Authorization and Agreement for Treasury Services" (Authorization) agreeing to be bound by the Treasury Booklet. The trial court found that the 2000 Corporate Resolution authorized Rosier and Robinson to enter an agreement for treasury services. On September 25, 2000, Associate Treasurer Lasana Mack signed a certification attesting to the authenticity of the signatures of Rosier and Robinson and to his own authority to execute the certification. The certification form states that "[i]f the client is a governmental entity, the entity's counsel must sign this Certification." Mr. Mack was not the District's counsel or a lawyer. A clause in the referenced Treasury Booklet provides for services described therein to be arbitrated "in accordance with the United States Arbitration Act . . . under the Commercial Arbitration Rules of the American Arbitration Association" (AAA Rules). The trial court found that although the Authorization states "in small print" that the Client received a copy of the Authorization and Agreement for Treasury Services, there was no evidence that the Booklet was provided to Robinson and Rosier when they signed signature cards.

In 2002, the Office of Contracting and Procurement for the Office of the Chief Financial Officer issued a request for proposals (RFP) for Controlled Disbursement

Account Services. The RFP required bidders to include in their proposals Paragraph 8, "Dispute Resolution," which provides:

> [i]f a dispute arises under or relates to the contract, a claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the District against the Contractor shall be subject to written decision by the Contracting Officer.[6]

The RFP stated that the Contracting Officer was "the only official authorized to contractually bind the District" and that the Contract Administrator had "the responsibility of ensuring that the work conforms to the requirements of the contract." The RFP also required that the Procurement Practices Act of 1985 (PPA) (D.C. Code § 2-301.01 *et seq.* (2001)) (PPA) be incorporated by reference into the contract.

---

[6] The RFP defines "claim" as

> a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or related to the contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the Claimant.

After a pre-bid conference attended by representatives from several banks, Bank of America submitted a Technical Proposal and Cost Proposal for the CDA contract. The Bank's Cost Proposal included the required clauses described in the RFP. The Bank's Technical Proposal included a Table of Contents that referenced an Agreements/Documentation section listing the following documents: (1) Terms and Conditions for Treasury Services; (2) Signature Card & Resolution; (3) Wire Transfer Form; (4) Automated Investment Service Agreement; (5) Bank of America Direct Profile; and (6) Electronic Pay Profile. It did not include a copy of the Treasury Services Terms and Conditions booklet. Following a page entitled "Agreements/Documentation," there were several blank forms, including Authorization and Agreement for Treasury Services, Authorization and Agreement Certification, Treasury Services Delegation of Authority, Business Signature Card, and a resolution for unincorporated associations, which, the Bank acknowledges, was included in error. A representative for the Bank testified that he intended that these documents become a part of the contract. The parties did not sign a contract at that time.

On March 31, 2005, the Office of Contract Procurement issued an amendment to the original 2002 RFP and requested that the banks that had responded previously

provide their Best and Final Offers for the CDA. A Bank of America representative, Mr. Bianchi, testified that he was told to update only the Bank's portion of the response; therefore, he updated the price proposal and included the same Agreements/Documentation section the Bank submitted previously. He also testified that he provided a copy of the Treasury Service Booklet in a separate packet with the intention that it would constitute additional terms of the contract. Mr. Bianchi signed the contract on behalf of the Bank, and on November 13, 2005, Ms. Angela Long Jiggets-Bazzi, a Contract Specialist, who worked in the Office of the Chief Financial Office, signed the contract. The 2005 contract includes the following language: "[t]he intent of this contract is for a contractor to manage the disbursement account in accordance with the published Request for Proposal." This contract also contains a merger clause which reads: "[t]his contract, including specifically incorporated documents, constitutes the total and entire agreement of the parties. All previous discussions, writings and agreements are merged herein."

After execution of the 2005 contract, District employees signed a number of signature cards and authorizations to remove and add new signatories to the CDA. On March 6, 2006, after becoming the District's OFT Treasurer, Mr. Mack signed an Authorization and Agreement for Treasury Services that states, in part, that the signer

has received the Treasury Services Booklet and agrees to adhere to its terms. Mr. Mack testified, however, that he thought he was simply opening two bank accounts and that he did not intend to modify the 2005 contract between the Bank and the District. That same day, the Chief of Staff for the Office of Finance and Treasury, Ulysses Glen, Jr., signed a form certifying that Mr. Mack's signature was the "true signature of a person authorized to execute the form on behalf of the Client." This certification form also states that for a governmental entity, its "counsel, or any other individual as permitted by the entity's organizational documents" should sign. The trial court found that Mr. Glen was not a lawyer and that no evidence was introduced to demonstrate his authority to sign the document on behalf of the District.

On April 17, 2006, Mr. Mack signed a signature card naming himself and two others as authorized signatories for various accounts with the Bank, including the CDA. This signature card stated that the signer was accepting the "Authorization" in the first part of the document that stated "[t]he deposit agreement we give you is part of your agreement with us regarding use of your account and tells you the current terms of our deposit accounts." Mr. Mack also testified that he did not intend to modify the parties' contract by signing the signature cards. The District exercised its option to extend the 2005 contract for one-year periods in October 2006, November

2007, and November 2008.


B. *The Trial Court's Ruling*


The trial court found that the parties' 2005 written contract governing dispute resolution and authority to modify the contract superseded "(1) any dispute resolution or forum selection clauses the Bank claims was previously agreed upon and (2) and any provision . . . which would allow other District officials to agree to arbitration in North Carolina (or elsewhere)."[7] Thus, the court could not find, as the Bank urged, that the 2006 Authorization and Agreement for Treasury Service signed by the Deputy CFO/Treasurer was validly executed or that any signature cards signed after the 2005 contract bound the District to the forum selection provision in the 2008 Deposit Agreement. The trial court declined to dismiss the claim asserted under the False Claims Act, reasoning that the PPA, which is incorporated into the 2005 contract, makes the Superior Court the appropriate forum for claims under that Act. As an additional legal basis for concluding that the parties had no agreement to arbitrate in North Carolina, the trial court held that the PPA withheld from District

---

[7] The trial court also found that the claims involved in the litigation fall within the scope of the arbitration and forum selection provisions set out in the Treasury Services Booklet and Deposit Agreement upon which the Bank relied.

officials the authority to agree to the arbitration and forum selection clauses in the documents relied upon by the Bank.

### III. Preliminary Issues

### A. *Jurisdiction*

The question of this court's jurisdiction was raised initially in an order to show cause why the appeal should not be dismissed as having been taken from a non-final order, which cited *Calomiris, supra*, 894 A.2d at 408, and *Hercules & Co., supra*, 592 A.2d at 1069. Subsequently, the court vacated the order to show cause, stating that "the Supreme court's decision in *Andersen LLP, supra*, 129 S. Ct. at 1896 may [a]ffect the applicability of *Calomiris*, 894 A.2d at 410," setting a briefing schedule, and directing the parties to discuss *Andersen* in their briefs. Appellant argues that *Calomiris* is not applicable to the present case and that *Andersen* and our case law support immediate appellate jurisdiction over appeals from denials of motions to compel arbitration. The District does not contend otherwise. Nevertheless, this court must be satisfied that it has jurisdiction. Therefore, we consider the jurisdictional questions raised by the motions panel.

The Bank argues that this court has jurisdiction because the appeal is from an order denying its motion to compel arbitration based on a written agreement that it contends governs the parties' contractual relationship. Citing *Andersen, supra*, 129 S. Ct. at 1896, the Bank contends that such orders have been held to be final and immediately appealable under 9 U.S.C. § 16 (a)(1)(A) of the Federal Arbitration Act and D.C. Code § 11-721 (a). In *Andersen*, the Supreme Court considered "whether appellate courts have jurisdiction under § 16 (a) [of the FAA] to review denials of stays by litigants who were not parties to the relevant arbitration agreement, and whether § 3 can ever mandate a stay in such circumstances."[8] *Andersen*, 129 S. Ct. at 1899. The District Court had denied petitioners' demand for arbitration and request for a stay, and the Sixth Circuit dismissed their interlocutory appeal for lack

---

[8] Section 16 (a)(1)(A) of the FAA provides that "[a]n appeal may be taken from . . . an order . . . refusing a stay of any action under Section 3 of this title." 9 U.S.C. § 16 (a)(1)(A) (2006). Section 3 provides, in pertinent part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3 (2006).

of jurisdiction. *Id.* at 1900. The Supreme Court reversed, holding that the Sixth Circuit had jurisdiction to review the denial of the § 3 stay and that a non-party to the arbitration agreement may invoke § 3 if the relevant state contract law permits him to enforce it. *Id.* at 1903. Pertinent to our jurisdictional question, the Supreme Court stated in *Andersen*:

> Ordinarily, courts of appeals have jurisdiction only over "final decisions" of district courts. 28 U.S.C. § 1291. The FAA, however, makes an exception to that finality requirement, providing that "an appeal may be taken from . . . an order . . . refusing a stay of any action under section 3 of this title." 9 U.S.C. § 16 (a)(1)(A). By that provision's clear and unambiguous terms, any litigant who asks for a stay under § 3 is entitled to an immediate appeal from denial of that motion — regardless of whether the litigant is in fact eligible for a stay. . . .

> . . . Jurisdiction over the appeal, . . . "must be determined by focusing upon the category of order appealed from, rather than upon the strength of the grounds for reversing the order." *Behrens v. Pelletier*, 516 U.S. 299, 311, 116 S. Ct. 834, 133 L.Ed. 2d 773 (1996). The jurisdictional statute here unambiguously makes the underlying merits irrelevant for even utter frivolousness of the underlying request for a § 3 stay cannot turn a denial into something other than "an order . . . refusing a stay of any action under section 3. 9 U.S.C. § 16 (a)."

*Id.* at 1900-01.

In the present case, the Bank demanded arbitration of the District's claims under the FAA as provided for in written documents that it contends govern the parties' relationship. Treating the Bank's request as a motion to compel arbitration, the trial court denied the motion after an evidentiary hearing, concluding that the controlling contract did not provide for arbitration. The trial court concluded, *inter alia*, that a subsequent agreement superseded any prior agreement providing for arbitration and that later agreements were ineffectual because the signatories to them lacked authority to bind the District. With one exception, it also denied a stay of all claims, thereby allowing the unstayed claims to proceed in another forum (*i.e.*, before the Contracting Officer and the Contract Appeals Board.) [9]

The Bank argues that, under *Andersen*, it is entitled to appellate review from the denial of its motion to compel arbitration and for a stay. *Andersen* supports the Bank's argument. Here, the Bank relied upon a written agreement containing a provision for arbitration under the FAA, albeit one that the trial court found, after an evidentiary hearing, had been superseded by subsequent agreements. Whether the Bank can prevail ultimately on its argument that the agreement containing the

---

[9] The trial court retained jurisdiction of only the fraud claim and stayed the action as to that claim.

arbitration provision controls goes to the merits of the controversy rather than the appellate court's jurisdiction to adjudicate it. As the Supreme Court stated in *Andersen*, jurisdiction over the appeal is determined by the category of the order appealed from rather than the strength of the grounds for overturning it. *Andersen, supra*, 129 U.S. at 1900. Thus, an appeal from the denial of the Bank's motion to compel arbitration and stay the court's denial of the motion would be immediately appealable under the FAA. *See id.* at 1900-01.

Moreover, case precedents from this court also support our jurisdiction to review the denial of the Bank's motion to compel arbitration. This court has exercised jurisdiction of an appeal from an order denying a motion to compel arbitration, concluding that it is a final order, appealable pursuant to D.C. Code §11-721 (a)(1).[10] *See, e.g.*, *2200 M Street LLC v. . Mackell*, 940 A.2d 143, 147 & 147 n.2 (D.C. 2007) (citing D.C. Code § 16-4317 (a)(1)[11] and *Umana v. Swindler & Berlin*,

[10]   D.C. Code § 11-721 (a)(1) (conferring jurisdiction upon the D.C. Court of Appeals from "all final orders and judgments of the Superior Court of the District of Columbia").

[11]   D.C. Code § 16-4317 (a)(1) then provided that for purposes of appeal, an order denying an application to compel or stay arbitration was a final order. This section was a part of the Uniform Arbitration Act, D.C. Code §§ 16-4301, -4319 (DCUAA) that was repealed effective July 1, 2009. 55 DCR 1847 (Feb. 27, 2008).

(continued...)

669 A.2d 717, 723 (D.C. 2005)) (other citation omitted). This court has also held that it had jurisdiction over the appeal of an interlocutory order denying a motion to compel arbitration under D.C. Code § 11-721 (a)(2)(A) because the order "'frustrate[d] arbitration.'" *Mausurovsky, supra* note 11, 687 A.2d at 201 n.1 (quoting *Brandon v. Hines*, 439 A.2d 496, 506-07 (D.C. 1981) and citing *Umana, supra*, 669 A.2d at 721 & n.11)). In *Brandon*, we concluded that an order denying a motion to confirm an arbitration award and requiring the parties to go to trial is an appealable interlocutory order dissolving an injunction under D.C. Code § 11-721 (a)(2)(A) (1973).[12] *Brandon*, 439 A.2d at 500. In reaching this conclusion, this court found persuasive the Supreme Court's opinion in *Carson v. Am. Brands, Inc.*, 450

---

[11](...continued)
The Revised Uniform Act also provides that an appeal may be taken from "[a]n order denying or granting a motion to compel arbitration." D.C. Code § 16-4427 (a)(1) (2001). This court has not resolved the question of the validity of the apparent jurisdictional grant by the Council to this court under the DCUAA or the Revised Uniform Act. *See Masurovsky v. Green*, 687 A.2d 198, 201, n.1 (D.C. 1996) (declining to decide the issue because of jurisdiction to review an interlocutory order under D.C. Code § 11-721 (a)(2)(A)); *Umana, supra*, 699 A.2d at 722 (holding that "the DCUAA does not attempt to confer jurisdiction upon this court under the circumstances of this case," and therefore, it need not decide whether D.C. Code § 16-4317 is consistent with the Home Rule Act).

[12] D.C. Code § 11-721 (a)(2)(A) confers jurisdiction upon the District of Columbia Court of Appeals from interlocutory orders of the Superior Court "granting, continuing, modifying, refusing, or dissolving or refusing to dissolve or modify injunctions." This section remains unchanged in the 2001 edition of the Code.

U.S. 79, 90 (1981), interpreting the federal interlocutory appeals statute that has language virtually identical to our local statute.[13] *Brandon*, 439 A.2d at 509. This court observed in *Brandon* that the trial court's order, if entered by a federal court, would have been "an appealable interlocutory order 'dissolving' an 'injunction' under 28 U.S.C. § 1292 (a)(1)." *Id.* Thus, we concluded that "denials — but not grants — of stays of litigation pending arbitration are appealable interlocutory orders, since only orders that frustrate (in contrast with facilitate) arbitration impose a sufficiently serious injury to justify an immediate appeal." *Id.* at 506-07.[14]

It was this court's decision in *Calomiris, supra*, that prompted the motions panel to raise the jurisdictional question. In *Calomiris*, this court dismissed for lack of jurisdiction an appeal from an order denying summary judgment to one of four trustees who argued that the trust instrument required that disputes over administration of the trust be resolved by arbitration. *Calomiris*, 894 A.2d at 408, 411. Appellant argued that this court had jurisdiction because the order appealed

---

[13] The federal appellate jurisdictional statute referenced was 28 U.S.C. § 1292 (a)(1) (1976).

[14] Under § 16-4427 of the current Revised Arbitration Act, "[a]n appeal may be taken from . . . An order denying *or* granting a motion to compel arbitration" (italics added).

from was either (1) a final appealable order under D.C. Code § 16-4317 (*i.e.*, an order denying a motion to compel arbitration), or (2) an appealable interlocutory order under *Brandon, supra*, 439 A.2d at 507 (*i.e.*, one that frustrates the arbitration process). *Calomiris*, 894 A.2d at 408-09. In *Calomiris*, we rejected the statutory argument because the arbitration provision at issue was established by Will, and not by contract as required for applicability of the statute.[15] *Id.* at 409-10. Thus, this court held in *Calomiris* that the will that contained the arbitration provision was not a contract within the meaning of the District's Uniform Arbitration Act. *Id*. at 410. Similarly, the court determined that the interlocutory order rule of *Brandon v. Hines* presupposed that the parties agreed by contract to arbitration, and therefore the rule was inapplicable to the facts presented. *Calomiris*, 894 A.2d at 410.

The condition precedent found lacking in *Calomiris* is present in this case. Here, the Bank does rely upon a written contract containing an arbitration provision. Although the trial court found that this contract was superseded by another agreement

---

[15] D.C. Code § 16-4317 (a)(1) provided that for purposes of appeal, certain orders shall be deemed final, including "[a]n order denying an application to compel arbitration made under section 16-4302." Proceedings to compel or stay arbitration under §16-4302 required a showing of an agreement as described in § 16-4301. (See note 9, *supra*). *Calomiris, supra*, 894 A.2d at 409. The court concluded that a Will establishing a trust is not a written agreement or contract. *Id.*

between the parties that does not provide for arbitration, such a merits determination cannot foreclose appellate review of the trial court's decision. *See Andersen*, *supra*, 129 S. Ct. at 1900. Otherwise, the trial court's determination that the contract with the arbitration clause was superseded and does not govern the dispute would effectively foreclose appellate review. Nothing in *Calomiris* requires such a result. For all of these reasons, we are satisfied that this court has jurisdiction of this appeal. *See Mackell, supra*, 940 A.2d at 147 n.2 (holding that denial of a motion to compel arbitration is a final appealable order allowing this court to exercise jurisdiction pursuant to D.C. Code § 11-721); *see also Andersen*, *supra*, 129 S. Ct. at 1900-01 (holding that the FAA provides for an immediate appeal of an order refusing a stay under the Act as determined by the category of the order appealed from rather than the strength of the grounds for reversal).

B. *Forum Challenge*

The Bank argues that the trial court erred in resolving the District's objections to the existence, scope or validity of the parties' arbitration agreement. It contends that, under applicable law, these issues are for the arbitrator; therefore, the trial court erred in denying its motion to compel arbitration. The District responds that its

challenges to the arbitration clause itself and to the validity of the post-2005 contracts based on whether the person lacked authority to bind the District are properly resolved by the court.[16]

---

[16] The District also argues that the Bank is judicially estopped from contending in this court that it was for the arbitrator to decide the validity and scope of the arbitration agreement because it affirmatively asserted a contrary position in the trial court. The Bank responds that the judicial estoppel rule does not apply because its position on appeal is not clearly inconsistent with the one it maintained in the trial court.

"The doctrine of judicial estoppel precludes a party from taking one position on an issue in the trial court and the opposite position on appeal." *Fairman v. District of Columbia*, 934 A.2d 438, 443 (D.C. 2007) (citations omitted). It is an equitable doctrine intended to protect the judicial process from improper use. *New Hampshire v. Maine*, 532 U.S. 742, 751-52 (2001) (citations omitted). Factors required for application of the doctrine include: (1) a clear inconsistency between the party's earlier position and later one; (2) success in asserting the prior position thereby creating the perception that one of the courts was misled; and (3) the realization of an unfair advantage by one party or the imposition of an unfair detriment to the opposing party. *Id.* at 752 (citations omitted).

The record supports the Bank's claim that the position it took in the trial court is not clearly inconsistent with the position it asserts on appeal. First, the District concedes that the Bank maintained in the trial court, as it does on appeal, that a challenge to the validity of the contract as a whole was for the arbitrator. Second, the record shows that the Bank argued that the arbitrator, not the court, had the authority to determine whether the District's claims are arbitrable. It contended that all the District's claims are subject to arbitration and therefore, the trial court should dismiss them or stay the action and direct the parties to proceed to arbitration. Finally, as the Bank points out, it was not successful in advancing these positions in the trial court. For these reasons, we agree that the judicial estoppel rule is not applicable here.

We start with the basic principle that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *accord*, *Sandvik AB v. Advent Int'l. Corp.*, 220 F.3d 99, 105 (3d Cir. 2000) (citation omitted) (noting that a party cannot be required to submit to arbitration when he has not agreed to do so because arbitration is a matter of contract). Generally, in deciding whether the parties agreed to arbitration, the courts apply ordinary state-law contract principles. *First Options*, 514 U.S. at 944 (citations omitted). This general rule is subject to qualification when deciding whether the parties have agreed to have the arbitrator decide the question of arbitrability. *Id.* With respect to this issue, the Supreme Court has admonished that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* (quoting *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)).

Challenges to arbitration agreements may be directed to the validity of the arbitration clause itself or to the contract as a whole. *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 444 (2006). Guided by § 4 of the FAA, the Supreme Court has held that a challenge to the making of the arbitration agreement itself is properly

resolved by court, while a challenge to the validity of the contract as a whole is for the arbitrator.[17] *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967) (holding that it is for the federal court to adjudicate a claim of fraud in the inducement of the arbitration clause itself, but not claims of fraud in the inducement of the contract as a whole); *Keeton v. Wells Fargo Corp.*, 987 A.2d 1118, 1122 (D.C. 2010) (holding that a claim that the arbitration clause is unconscionable disputes its validity and is for the court, not the arbitrator, to decide). More recently, in *Buckeye*, the Supreme Court summarized these principles, as extracted from its precedents, that are pertinent to the issue presented here.

> First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, *unless the challenge is to the arbitration clause itself*, the issue of the contract's validity is

---

[17] Section 4 of the FAA provides in pertinent part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in a manner provided for in such agreement . . . . [U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement . . . .

considered by the arbitrator in the first instance. Third, this
arbitration law applies in state as well as federal courts.

*Buckeye*, 546 U.S. at 445-46 (citing *Prima Paint*, 388 U.S. at 403 and 404 and
*Southland Corp. v. Keating*, 465 U.S. 1 (1984))[18] (emphasis added). With these
principles in mind, we review the parties' respective arguments.

The Bank asserts that the arbitration clause in the Treasury Booklet that
incorporates by reference the AAA Commercial Arbitration Rules requires the parties
to submit the arbitrability question itself to arbitration. Specifically, the Bank cites
Rule R-7 that provides:

> (a) The arbitrator shall have the power to rule on his or her
> own jurisdiction, including any objections with respect to
> the existence, scope or validity of the arbitration
> agreement.
>
> (b) The arbitrator shall have the power to determine the

---

[18] In *Southland, supra*, the Supreme Court held that the FAA created a body
of federal substantive law applicable in state and federal courts, and it rejected the
notion that, even for state law claims in state court, state-law could bar enforcement
of § 2 of the FAA. 465 U.S. at 10-14. Section 2 provides that a written provision in
a contract to settle or submit to arbitration a controversy arising out of it "shall be
valid, irrevocable, and enforceable, save upon such grounds as exist at law or in
equity for the revocation of any contract." 9 U.S.C. § 2.

> existence or validity of a contract of which an arbitration clause forms a part. Such arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

Commercial Arbitration Rule R-7. The Bank argues that incorporation of these rules into the contract show "clearly and unmistakably" that the parties intended for the arbitrator to decide the issue of arbitrability. *See First Options, supra*, 514 U.S. at 944 (requiring that the parties' intention for the arbitrator to decide arbitrability be shown "clearly and unmistakably"). In support of its position, the Bank relies primarily upon the Supreme Court's decision in *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772 (2010). This case does not support the Bank's position that the issue of arbitrability is for the arbitrator.

The issue in *Rent-A-Center* was whether under the FAA, a district court may decide a challenge to a contract as unconscionable where the agreement expressly delegated that authority to the arbitrator. *Rent-A-Center, supra*, 130 S. Ct. at 2775. Respondent Jackson had sued his former employer, Rent-A-Center, for discrimination, but as a condition of employment, he had signed an agreement that precluded him from pursuing his claims in court. *Id.* at 2775. The agreement gave

the arbitrator the exclusive authority to resolve any dispute concerning the enforceability of the agreement.[19]  *Id.*  The District Court granted Rent-A Center's motion to compel arbitration, but a divided panel of the Ninth Circuit reversed in part, holding that "the threshold question of unconscionability is for the court."  *Id.* (quoting *Jackson v. Rent-A-Center West, Inc.*, 581 F.3d 912, 917 (9th Cir. 2009)).  The Supreme Court reversed, holding that, *absent a specific challenge to the arbitration provision itself*, the court must treat this delegation provision as valid under § 2 of the FAA and leave the challenge to the validity of the agreement as a whole to the arbitrator.[20]  *Id.* at 2779.  Thus, *Rent-A-Center* suggests a different outcome had petitioner preserved a specific challenge to the provision delegating arbitrability to the arbitrator.  *See  id*. at 2779-80; *see also Prima Paint, supra*, 388 U.S. at 403-04; *Keeton, supra*, 987 A.2d at 1122.

Unlike petitioner in *Rent-A-Center*, the District directs one of its challenges to

---

[19]  The agreement provided that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all of any part of the Agreement is void or voidable"  *Rent-A-Center, supra*, 130 S. Ct. at 2775.

[20]  Petitioner challenged specifically the delegation provision for the first time in the Supreme Court, and therefore, the Court would not consider it.  *Rent-A-Center, supra*, 130 S. Ct. at 2781.

the validity of the arbitration clause itself. The District argues that it never entered an agreement to arbitrate any contract-related dispute because no authorized agent for the District had authority to sign such an agreement. Therefore, the District's reliance upon *Rent-A-Center* is well-placed. In *Rent-A-Center, supra*, the Supreme Court stated that where a party challenges the agreement to arbitrate at issue under § 2 of the FAA, then the court must decide the issue. *Id.* at 2778. Many appellate courts, including this court, have held that it is for the court, rather than an arbitrator, to decide the validity of the arbitration clause. *See Keeton*, *supra*, 987 A.2d at 1122 (citing *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 39 (D.C. 1989); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1263-64 (9th Cir. 2006) (en banc); and *Burden v. Check Into Cash of Ky. LLC*, 267 F.3d 483, 491 (6th Cir. 2001)) (holding that it was for the court to decide the validity of an arbitration clause itself in a form contract.). Likewise, in the present case, it was for the court to determine whether the District, through authorized agents, ever agreed to be bound by the arbitration provision. Unless the District agreed to arbitration, it cannot be forced to have its dispute, including questions of arbitrability, heard in a private forum. Therefore, the trial court properly considered in the first instance the District's challenge to the arbitration provision under the circumstances presented here.

The Bank also argues that, insofar as the District's position is that the agreement containing the arbitration provision is superseded by subsequent agreements, its challenge is to the contract as a whole, and therefore, must be resolved by the arbitrator. It contends that to the extent that the trial court relied upon the merger clause in the 2005 contract to invalidate the 2000 Corporate Resolution authorizing various District employees to act on its behalf, "it impermissibly operates to invalidate the underlying Treasury Booklet and Deposit Agreement as a whole and, therefore, the issue of contract validity should have been submitted to arbitration." The District responds that because the validity of the post-2005 contracts that the Bank alleges the District entered turns on whether the person who signed lacked authority to bind the District, resolution by the court is appropriate.

For this argument, the Bank relies upon cases holding that challenges to the validity of the contract as a whole are for the arbitrator to decide. These include: *Buckeye, supra*, 546 U.S. at 449 (reaffirming that in both federal and state courts, "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."); *Rent-A-Center, supra*, 130 S. Ct. at 2779 (requiring for court intervention that the challenge be directed to the agreement to arbitrate itself and leaving the challenge to the agreement as a whole to the

arbitrator); *Prima Paint Corp., supra*, 388 U.S. at 403-04 (challenges to the arbitration agreement itself go to the court, while challenges to the entire contract of which arbitration is a part are for the arbitrator); *see also Menna v. Plymouth Rock Assurance Corp.*, 987 A.2d 458, 465 n.30 (D.C. 2010) (noting that the validity of the contract with an arbitration clause is for the arbitrator unless the challenge is directed specifically to the validity of the arbitration clause itself under the District's Revised Uniform Arbitration Act).[21]   The Bank contends that resisting arbitration on the ground that the agreement in which the arbitration provision is found is superseded by later agreements is tantamount to contesting the contract as whole, and thus, the principle from the cases it cites applies to require consideration by the arbitrator.

The District acknowledges the general principles extracted from these cases. However, it contends that where the issue turns on whether the person who signed the contract lacked authority to commit the principal, judicial review is appropriate, a point referenced in *Buckeye, supra*, which the District cites.  In *Buckeye*, the Supreme Court considered whether a court or an arbitrator should decide the claim that the contract containing an arbitration provision was void because it violated state lending and consumer-protection laws.  *Buckeye*, 546 U.S. at 442.  Reversing the Florida

---

[21]  D.C. Code §§ 16-4401 to -4432 (Supp. 2009).

Supreme Court, the Court held that this challenge to the validity of the contract as a whole was for the arbitrator. *Id.* at 446. While reaffirming this general principle and finding it to be applicable in *Buckeye*, the Supreme Court also stated that

> [o]ur opinion . . . does not speak to the issue decided in the cases . . . which hold that it is for the courts to decide whether the alleged obligor ever signed the contract, . . . [or] whether the signor lacked authority to commit the alleged principal, *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99 (C.A. 3 2000);[22] *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587 (C.A. 7 2001))[23] . . . .

*Buckeye*, 546 U.S. at 444 n.1. This is the essence of the District's challenge here. It contends that it never agreed to arbitration because its 2005 contract did not provide

---

[22] In *Sandvik*, the Third Circuit affirmed the District Court's denial of a motion to compel arbitration where the other party claimed that the agent who signed the agreement lacked authority to sign it and so notified Sandvik. *Sandvik, supra*, 220 F.3d at 101. The court held that when the very existence of the agreement was disputed, the district court properly refused to order arbitration until it resolved the threshold question of whether the arbitration agreement exists. *Id.* at 111.

[23] In *Sphere Drake*, the Seventh Circuit held that whether a broker had authority to bind Sphere Drake on reinsurance contracts containing an arbitration provision was appropriate for resolution by the court. *Sphere Drake, supra*, 256 F.3d at 592. The court distinguished the Supreme Court's decision in *Prima Paint* in which the Supreme Court held that it was for the arbitrator to resolve a claim of fraud in the inducement of the contract. *Id.* at 590. It noted that in *Prima Paint*, the parties actually reached an agreement, while in *Sphere Drake,* whether there ever was an agreement was the issue, and arbitration is contractual. *Id.* at 590-91.

for it and none of its employees were authorized to bind the District to arbitration. Thus, we conclude that the trial court was the proper forum in which to determine whether the District, through its duly authorized agent, ever agreed to arbitration.

## IV.  Merits Analysis

### A.  *Standard of Review and Generally Applicable Legal Principles*

The court reviews *de novo* an order denying a motion to compel arbitration. *Fleetwood Enter. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) (citing *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257 (5th Cir. 1996)); *see also Mausurovsky, supra* note 11, 687 A.2d at 202 (citation omitted) (reviewing denial of a motion to compel arbitration under the *de novo* standard).  When the trial court sits as the trier of fact, we review its factual findings under the "clearly erroneous" standard.  *Psaromatis v. English Holdings, I, L.L.C.*, 944 A.2d 472, 481 (D.C. 2008) (citations omitted).  We accord the trial court's factual findings considerable deference, and we will not reverse them unless plainly wrong or without evidentiary support.  *Id.* (citing D.C. Code § 17-305 (a) (2001)) (providing that for non-jury cases, "the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly

wrong or without evidence to support it."). Thus, when the facts lend themselves to more than one interpretation, this court defers to the trial court's judgment. *Davis v. United States*, 564 A.2d 31, 35 (D.C. 1989) (en banc) (citations omitted). This court reviews the trial court's legal conclusions *de novo*. *Chibs v. Fisher*, 960 A.2d 588, 589 (D.C. 2008) (citing D.C. Code § 17-305 (2001)).

In reviewing a decision to compel arbitration under the Federal Arbitration Act, we consider first whether the parties had an agreement to arbitrate the dispute. *Fleetwood Enter., supra*, 280 F.3d at 1073 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 62 (1985)) (citation omitted). We make this determination based on ordinary state-law contract principles. *Id.* (citing *First Options of Chicago, supra*). The FAA does not require parties to arbitrate a dispute unless they have agreed to do so. *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). If it is determined that the parties had a valid agreement to arbitrate, then we consider next whether the parties' dispute falls within the scope of their agreement. *Fleetwood Enter.*, 280 F.3d at 1073 (citing *Webb v. Investacorp*, 89 F.3d 252, 258 (5th Cir. 1996)).

The Bank argues that, in performing our *de novo* review, we must consider the

national policy favoring arbitration. However, as the District points out, "th[e] federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead '[o]rdinary contract principles determine who is bound.'" *Fleetwood Enter., supra*, 280 F.3d at 1073 (quoting *Daisy Mfg. Co., Inc. v. NCR Corp.*, 29 F.3d 389, 392 (8th Cir. 1994)) (other citation omitted); *see also Granite Rock Co. v. Int'l Bd. of Teamsters*, 130 S. Ct. 2847, 2859-60 (2010) (holding the presumption in favor of arbitration applicable only "where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate . . . [is] best construed to encompass the dispute."); *accord*, *Masurovsky, supra* note 11, 687 A.2d at 205. In *Masurovsky*, this court rejected an argument similar to the Bank's argument here, concluding that the "initial determination whether a 'valid arbitration agreement' exists must be determined apart from the presumption [in favor of arbitration.]" *Id.* In reaching this conclusion, we relied upon the Supreme Court's reiteration of the principle that in deciding whether parties have agreed to arbitrate, courts should generally apply state law contract principles and its omission of any suggestion that these principles should be superseded by the federal presumption. *Id.* (citing *First Options of Chicago, supra*, 514 U.S. at 938). Consistent with these established principles, we conclude here that the presumption in favor of arbitration attaches only after the court finds initially that

a valid agreement to arbitrate exists. *Id.* With these principles in mind, we turn to consideration of whether the parties agreed to arbitrate the dispute.

## B. *Contract Issues*

The Bank argues that it had a contractual agreement with the District to arbitrate claims in North Carolina. It contends that officials in the Office of the Chief Financial Officer (OCFO) agreed to the terms set forth in its Treasury Services Booklet which included a provision for arbitrating disputes related to the Controlled Disbursement Account. On appeal, the District argues, as it did in the trial court, that there was no agreement to arbitrate contract or fraud claims because OCFO employees lacked actual authority to enter such agreements by reason of provisions in the PPA. The trial court agreed with the District's position, ruling that at the times relevant to the controversy, OCFO officials lacked the authority under the PPA to agree to arbitration in North Carolina. Further, the trial court concluded that the 2005 contract incorporating the PPA evidenced the parties' intent to adhere to the PPA in its dealings with the Bank. The court also found that the 2005 contract provisions governing dispute resolution and authority to modify the contract superseded any dispute resolution or forum selection clauses previously agreed upon by the parties. The Bank challenges each of these rulings.

## 1. *Scope of Authority of OCFO Employees*

Contrary to the trial court's ruling and the District's position, the Bank argues that the OCFO was authorized to agree to arbitrate the District's claims. The District responds that its employees, including those in the OCFO, who were bound by the PPA, lacked authority to agree to arbitrate contract claims and claims involving fraud.[24]

The District relies for its argument principally upon the PPA statute and this court's decision in *District of Columbia v. Greene*, 806 A.2d 216 (D.C. 2002), in which this court addressed a similar issue. In *Greene*, Verizon South claimed that it had an agreement with the District to submit contract disputes to arbitration, while the District claimed that it did not because it could not agree to arbitration under the PPA. *Greene*, 806 A.2d at 218. In determining whether to enjoin arbitration until the matter was resolved by the Contract Appeals Board (CAB), this court construed applicable provisions of the PPA and determined that the District was likely to prevail on the merits of its argument that its employees could not agree to arbitration under that PPA. *Id.* 220-22. In reaching this conclusion, this court observed that the PPA

---

[24] For purposes of this appeal, the District does not contend that its contracting officers lack authority to agree to arbitration as a general proposition.

plainly established the CAB as the exclusive hearing tribunal for determining the contract claims at issue in the case. *Id.* at 220. The court found persuasive the following provisions of the PPA, which are relevant to the issues we address here:

> D.C. Code § 2-308.03 (a)(1) states that . . . "[a]ll claims by the District government against a contractor arising under or relating to a contract shall be decided by the contracting officer . . . ." In like fashion § 2-308.05 (a) provides that "[a]ll claims by a contractor against the District government arising under or relating to a contract shall be . . . submitted to the contracting officer for a decision." In § 2-309.03(a), the statute goes on to declare that "[t]he [Contract Appeals] Board shall be the exclusive hearing tribunal for, and shall have jurisdiction to review and determine de novo: . . . (2) Any appeal by a contractor from a final decision by the contracting officer on a claim by a contractor, when such claim arises under or relates to a contract; and (3) Any claim by the District against a contractor, when such claim arises under or relates to a contract."

*Greene*, 806 A.2d at 220 (citing the quoted sections).

Interpreting these and other provisions of the PPA, this court concluded in *Greene* that the PPA, in effect, withheld from the District's contracting officers the power to agree to arbitration by specifying the manner in which the District may

procure property, supplies and services [25] and designating the CAB as the sole hearing tribunal for resolution of contract disputes. *Greene*, 806 A.2d at 222. Also pertinent to the court's decision, under local contract law, a contracting officer cannot obligate the District to terms that exceed his or her actual authority. *Id.* at 222 (citing *Coffin v. District of Columbia*, 320 A.2d 301, 303 (D.C. 1974)). Thus, here, as in *Greene*, District employees or entities subject to the PPA would have had no authority to agree to a dispute resolution procedure different than the one specified by law. The general rule is that persons contracting with a municipal corporation must take notice of the nature and extent of its agent's authority. *Id.* at 222 and 222 n.7 (citing *Chamberlain v. Barry*, 606 A.2d 156, 159 (D.C. 1992), and *Coffin*, 320 A.2d at 303 (quoting 10 McQuillan Municipal Corporations § 29.04 at 219-22 (3d ed. 1966)). Thus, the Bank was bound to note any statutory limitation on the authority of those in the District with whom it contracted.

To counter these authorities, the Bank argues that there is no statutory provision specifically precluding the OCFO from agreeing to arbitrate. This argument was made and rejected in *Greene*. As this court explained in that case, this "argument is difficult, if not impossible, to square with the language of § 2-309.03

---

[25] *See* D.C. Code § 2-301.01.

(a) making the CAB 'the exclusive hearing tribunal' for claims of the kind enumerated." *Greene*, 806 A.2d at 220 (citation omitted). Thus, contracting officers who were bound by the PPA did not have authority to agree to resolve contract disputes in another forum in another state.

We find unpersuasive the Bank's assertion that *Greene* is not supportive of the District's position because it involved consideration of injunctive relief rather than a decision on the merits of the claim. In determining whether to grant this extraordinary remedy, the court had to decide whether there was a substantial likelihood that the moving party would prevail on the merits. *See Greene, supra*, 806 A.2d at 219-20 (citing *District of Columbia v. Grp. Ins. Admin.*, 633 A.2d 2, 21 (D.C. 1983) (quoting *Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C. 1976)). This required the court to address squarely the same question raised here, *i.e.*, whether the PPA withheld authority from its contracting officers to agree to arbitration. In doing so, the court had to construe the PPA statute before deciding whether the District was likely to prevail on its claim. Thus, we agree that *Greene* is good authority for the District's position here. Moreover, we are persuaded by its statutory analysis of the issue.

Next, the Bank argues that the OCFO is exempt from PPA provisions regarding contracting authority. It contends that D.C. Code § 2-301.04 (a) and subsequent

Congressional enactments confirm the independent authority of the OCFO to contract and therefore to agree to arbitration.[26] The District responds with authorities supporting its claim that the OCFO has always been bound by the PPA.

The section of the Code upon which the Bank relies for its exemption argument reads in pertinent part as follows:

> . . . [the PPA] shall apply to all departments, agencies, instrumentalities, and employees of the District government . excluding . . ., and (to the extent described in § 1-204.26) the Office of the Chief Financial Officer of the District of Columbia . . . .

D.C. Code § 2-301.04 (a) (2001) ("2005 exemption").[27] However, as the District points out, § 2-301.04 (a)'s exemption is subject to the limitation forth in § 1-204.26. Although § 1-204.26 provided for the CFO to carry out procurement of goods and services for the OCFO through an office independent of the Chief Procurement

---

[26] The Congressional actions referenced by the Bank are: District of Columbia Appropriations Act, 2006, 109 Pub. L. No. 115, § 132, 119 Stat. 2508, 2522 (2005); Continuing Appropriation Resolution 2007, Pub. L. No. 109-289, § 127(b), 120 Stat. 1311, 1316 (2006); H.J. Res. 100, 109 Pub. L. No. 369, 120 Stat. 2642 (2006); H.J. Res. 102, 109 Pub. L. No. 383, 120 Stat. 2678 (2006).

[27] This provision was repealed effective April 8, 2011. D.C. Law 18-371, § 1201(a).

Officer (CPO), it made the OCFO subject to the same procurement provisions applicable to the CPO. *See* D.C. Code § 1-204.26.[28] Thus, while § 2-301.04 (a) provided the OCFO with independent contracting authority, it made it subject to the PPA's procurement provisions to the same extent as the CPO. The Bank argues that such an interpretation would render the exclusion in § 2-301.04 (a) meaningless, contrary to the rule of statutory construction requiring that effect be given to each statutory provision, absent express legislative intent to the contrary. It contends that to give effect to both statutes, §1-204.26 must be interpreted to authorize the OCFO to procure goods and services independent from the PPA except when its procurement is carried out by the OCFO's Chief Procurement Officer.[29]

---

[28] D.C. Code § 1-204.26 provides in pertinent part as follows:

> The Chief Financial Officer shall carry out procurement of goods and services for the Office of the Chief Financial Officer through a procurement office or division which shall operate independently of, and shall not be governed by, the Office of Contracting and Procurement . . . or any successor office, *except the provisions applicable under such unit to procurement carried out by the Chief Procurement Officer established by § 2-301.05 or any successor office shall apply with respect to the procurement carried out by the Chief Financial Officer's procurement office or division*. (Emphasis added.)

[29] The Bank relies upon the September 25, 2000 and March 6, 2006 TSB Authorizations because they were not carried out by OCFO's Chief Procurement

(continued...)

We have no quarrel with the Bank's recitation of the rule of statutory construction;[30] however, its application of the rule here is flawed. Both § 2-301.04 (a) and § 1-204.26, referenced therein, can be given effect without one defeating the purpose of the other. While § 2-301.04 (a) provided for independent contracting authority for the OCFO, § 1-204.26 simply required that in exercising that authority, the OCFO adhere to the same statutory procurement requirements by which the District's CPO was bound. This interpretation, persuasively urged by the District, is consistent with the plain meaning of the statutes. *See Boyle v. Giral*, 820 A.2d 561, 568 (D.C. 2003) (setting forth the principle that we look first to the plain meaning of a statute in interpreting it, read in light of the statute as a whole) (citation omitted). There is nothing in the statute that suggests, as the Bank contends, that District officials in the OCFO's Office of Finance and Treasury, as opposed to those in the Procurement Office, were at liberty to ignore the requirements of the PPA.[31] In any

---

[29] (...continued)
Officer.

[30] *See Detweiler v. Pena*, 38 F.3d 591, 594 (D.C. Cir. 1994) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("When two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.")); *see also Abadie v. District of Columbia*, 843 A.2d 738, 742 (D.C. 2004) (stating that "[i]f related statutes conflict, we must reconcile them"). (Citation omitted).

[31] The 2000 and 2006 TSB Authorizations were executed by District Officials in the OCFO's Office of Finance and Treasury, acting under a 2000 corporate
(continued...)

event, the parties' 2005 contract, hereinafter discussed, incorporated the PPA, and thus, as the trial court determined, "evidence[d] the intent of the OCFO to adhere to the PPA with respect to its dealings with the [Bank]."

This court's decision in *Abadie, supra*, 843 A.2d at 738, relied upon by the District, supports its argument that the OCFO was subject to the PPA. In *Abadie*, this court concluded that, with limited, specified exceptions, the PPA applied to the OCFO during "control years."[32] *Id*. at 745-46. The court noted in *Abadie* that § 2-301.04 (a), which sets forth governmental entities exempt from the PPA, did not include the OCFO, although it did list the Control Board for exemption. *Id*. at 743. Consistent with the legislative history and rules of statutory interpretation, this court held in *Abadie* that the OCFO's exemption for control years applied only to the types of

---

[31](...continued)
resolution. The Bank contends that these particular officials were not bound by the PPA.

[32] The Procurement Reform Amendment Act of 1996 (effective April 1997) (Reform Act) exempted the OCFO from provisions of the PPA during control years, and required the OCFO to "adopt . . . the procurement rules and regulations adopted by the District of Columbia Financial Responsibility and Management Assistance Authority [Control Board]." D.C. Code § 2-301.04 (c) (2001). A control year is "any fiscal year for which a financial plan and budget approved by the [Control Board] . . . is in effect, and includes Fiscal Year 1996." D.C. Code § 47-393 (4) (2005). In *Abadie, supra*, this court considered and interpreted several statutory provisions related to its decision including those related to the OCFO and the PPA. *See Abadie*, 843 A.2d at 741, 742-44.

contracts listed in the sentence that immediately preceded it, *i.e.*, those for professional services of "accountants, lawyers, and other experts." *Id.* at 745.

The Bank argues that even if *Abadie* could be construed as subjecting the OCFO to the PPA, its holding was rejected by subsequent Congressional enactments, specifically, the District's 2006 Appropriations Act, which became law on November 30, 2005 (effective retroactively from April 1997), three extensions of the 2005 exemption, and permanent codification of the exemption in D.C. Code § 2-301.04. The District responds that there is no evidence that Congress considered or intended to overrule *Abadie* and that the 2006 Appropriations Act did not exempt the OCFO from the dispute resolution provisions of the PPA or render ineffective the terms of the parties' 2005 contract incorporating the PPA that was executed before enactment of the statute.

The 2006 Appropriations Act provided that

> [t]he entire process used by the Chief Financial Officer to acquire any and all kinds of goods, works, and services by any contractual means . . . shall be exempt from all of the provisions of the District of Columbia's Procurement Practices Act: *Provided*, That provisions made by this subsection shall take effect as if enacted in D.C. Law 11-259 [(the 1996 Procurement Reform Amendment Act)] and

shall remain in effect until September 30, 2006.

District of Columbia Appropriations Act, 2006, Pub. L. No. 109-115, § 132, 119 Stat. 2396, 2522 (2005).[33] While the 2006 Act exempted the OCFO from the PPA with respect to the acquisition of goods and services by contract, it did not address the administration of any contract entered or the resolution of disputes arising therefrom covered by sections of the PPA. To that extent, it left intact other provisions of the PPA governing contract administration. Neither the plain language of these enactments nor the legislative history cited by the Bank supports its argument that Congress intended to overrule *Abadie*.[34] When overruling court decisions, Congress has been explicit in the past.[35]

----

[33] This exemption was extended three times through February 15, 2007. *See* Continuing Appropriations Resolution 2007, Pub. L. No. 109-289, § 127 (b), 120 Stat. 1311, 1316 (2006) (extension through 11/17/06); H.J. Res. 100, 109 Pub. L. No. 369, 120 Stat 2642, 2642 (2006) (extension through 12/8/06); H.J. Res. 102, 109 Pub. L. No. 383, 120 Stat. 2678, 2678 (2006) (extension through 2/15/07).

[34] Reference is made to H.R. Conf. Rep. 109-307 (2005), 205 WL 3131557: S. Rep. 109-109 (2005) (2005), reprinted in 2006 U.S.C.C.A.N. 1260.

[35] *See*, *e.g.*, *Molovinsky v. Fair Emp't Council of Greater Washington, Inc.*, 683 A.2d 142, 148 n.11 (D.C. 1996) (Noting that "[t]he legislative history makes clear that Congress specifically intended to overrule *Luck* [*v. United States*, 121 U.S. App. D.C. 151, 348 F.2d 763 (1965)], rejecting the *Luck* rule as 'absolutely unworkable.' H.R. Rep. No. 91-907, [91t Cong., 2d Sess. 62, 63 (1970)]"; *Brown v. United States*, 518 A.2d 446, 447- 48 n.3 (D.C. 1986) (referencing legislative history reflecting Congressional intent to overrule definition of a term in a particular case as

(continued...)

48

The District argues that the process used to acquire the Bank's services had concluded before this law was enacted. Although this provision was made retroactive to 1997, the District argues that the 2006 Act did not invalidate the parties' 2005 agreement to be bound by the PPA, as the Bank suggests. As it points out, the "laws in effect at the time of the making of a contract form a part of the contract 'as fully as if they had been expressly referred to or incorporated in its terms.'" *Double H. Hous. Corp. v. Big Wash, Inc.*, 799 A.2d 1195, 1199 (D.C. 2002) (quoting *Farmers & Merchants Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649, 660 (1923)) (other citation omitted); *accord*, *Akassy v. William Penn Apts. Ltd. P'ship,* 891 A.2d 291, 300 (D.C. 2006). In this case, the parties specifically incorporated into the 2005 contract the PPA, the law in effect at the time.

The District contends that the PPA is even clearer in precluding OCFO employees from agreeing to arbitrate claims involving fraud. While the PPA authorized contracting officers to resolve contract disputes (*see* D.C. Code § 2-308.03 (a)(1) (2006 Repl.)), it did "not authorize the contracting officer to settle, compromise, pay or otherwise adjust any claim involving fraud." D.C. Code § 2-308.03 (a)(4)

---

[35](...continued)
reflected in H.R. Rep. No. 907, 91st Cong. 2d Sess. 62 (1970)).

(2006 Repl.)).[36]   The District argues that this express prohibition precluded a contracting officer for the District  from agreeing to arbitration of claims involving fraud.

A preliminary question raised by the District's position is whether an agreement to arbitrate a dispute falls within the parameters of these PPA prohibitions.  The answer depends to some extent upon the meaning of the term "arbitration." This court has observed previously that The Federal Arbitration Act "is silent on the definition of 'arbitration.'"[37] *See Washington Automotive v. 1828 L St. Assocs.*, 906 A.2d 869, 875 (D.C. 2006); *see also Harrison v. Nissan Motor Corp. In U.S.A.*, 111 F.3d 343, 350 (3d Cir. 1997) (noting that the FAA does not define "arbitration," and that "courts and commentators have struggled to do so.").  In determining whether a certain appraisal process constituted an arbitration under the FAA, the Tenth Circuit noted that "[c]entral to any conception of classic arbitration is that the disputants empowered a third party to render a decision settling their dispute." *Salt Lake Tribune v. Mgmt. Planning*, 390 F.3d 684, 689 (2004) (citation omitted).  Also essential to rendering the

---

[36]  D.C. Code § 308.03 was repealed effective April 8, 2011, D.C. Law 18-371, § 1201(a).

[37]  Similarly, this court noted that the D.C. Arbitration Act did not define the term "arbitration." *Washington Automotive*, *supra*, 906 A.2d at 875.

process an arbitration is that the third party's decision will settle the dispute. *Id.* at 690 (citation omitted). In defining arbitration in *Harrison, supra*, the court stated, "[a]lthough it defies easy definition, the essence of arbitration . . . is that, when the parties agree to submit their disputes to it, they have greed to arbitrate these disputes through to completion." 111 F.3d at 350. Dictionary definitions include these described elements, including binding and final settlement or resolution of a dispute by a designated third party.[38] The PPA precludes contracting officers from settling or adjusting disputes involving fraud. When the government is a party to a contract, its representative must have actual authority in order to bind the government to it. *See Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (setting forth actual authority as an element of proof required to prove an express or implied-in fact contract with the government); *accord*, *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998). It follows rationally that a government representative cannot delegate to another actual authority that he or she does not possess. In short, contracting officers bound by the PPA cannot agree to settle, compromise or otherwise

---

[38] For example, arbitration is defined as "[a] method of dispute resolution involving one or more neutral third parties who are usually agreed to by the disputing parties and whose decision is binding." *Black's Law Dictionary*, 112 (8th ed. 2009). *Webster's Third New International Dictionary* defines "arbitration" as "the hearing and determination of a case between parties in controversy by a person or persons chosen by the parties or appointed under statutory authority instead of by a judicial tribunal provided by law." *Webster's Third New International Dictionary*, 110 (3d ed. 1993).

adjust fraud claims, and they cannot delegate to others the authority to do so. Thus, we agree with the District that the PPA withheld authority from OCFO employees to agree to arbitrate fraud claims as well as contract claims. "A person making or seeking to make a contract with a municipal corporation is charged or imputed with knowledge of the scope of the agency's authority." *Chamberlain v. Barry*, 606 A.2d 156, 159 (1992) (citing *Coffin, supra*, 320 A.2d at 303).

## 2. *Preemption*

The Bank argues that even if the PPA did apply to the OCFO, the FAA preempts state laws like the PPA. It contends that the FAA prohibits state law from interfering with the objectives of the FAA, and therefore, the District's argument that the PPA withheld authority from District officials to agree to arbitration must fail. Unquestionably, the FAA "establishes a national policy favoring arbitration *when the parties contract for that mode of dispute resolution*." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008) (citing *Southland Corp. v. Keating*, 465 U.S. 1 (1984)) (emphasis added). The FAA provides for the application of federal substantive law regarding arbitration in both federal and state courts. *Id.* (citing *Southland*, 465 U.S. at 16). Relying upon *Preston*, the Bank argues that the PPA's grant of exclusive jurisdiction of FCA claims to Superior Court and contract claims to the Contracting Officer and the CAB is

superseded by the FAA. The District counters that *Preston* did not involve a statute that withheld authority from a government employee to agree to arbitrate, but rather one that bars enforcement of otherwise enforceable arbitration agreements. The District argues that the former is permissible, while the latter is not. The District has the better argument on this point.

In *Preston*, there was no dispute that the parties had a written agreement providing for arbitration. The Supreme Court held that "*when parties agree to arbitrate all questions arising under a contract*, state laws lodging primary jurisdiction in another forum, whether judicial or administrative, are superseded by the FAA." *Id.* at 349-50 (emphasis added). Preston, claiming fees allegedly due under a contract with Ferrer, sought arbitration under an arbitration clause covering "any dispute . . . relating to the terms of [the contract] or breach, validity, or legality thereof . . . in accordance with the rules [of the American Arbitration Association]." *Id.* at 350. Ferrer petitioned the California Labor Commissioner to have the contract declared void under the California Talent Agencies Act (TAA)[39] because Preston had acted as a talent agent without the requisite license. *Id.* Although finding a basis for the exercise of jurisdiction, the Labor Commission's hearing officer denied Ferrer's

---

[39] Cal. Lab. Code Ann. § 1700 *et seq.* (West 2003 and Supp. 2008).

motion to stay arbitration for lack of authority to grant such relief. The Los Angeles Superior Court denied Preston's motion to compel arbitration, and the California Court of Appeals affirmed, holding that the TAA vests "exclusive original jurisdiction" over the dispute in the Labor Commissioner. The California Supreme Court denied review, and the Supreme Court granted certiorari to determine whether the FAA overrides state law vesting initial adjudicatory authority in a state administrative agency. The Supreme Court determined that the TAA conflicts with the FAA's dispute resolution mechanism in that (1) it granted exclusive jurisdiction to the Labor Commissioner to decide an issue that the parties agreed to arbitrate, and (2) it imposed prerequisites to enforcement of the arbitration agreement not applicable to contracts generally. *Id.* at 356. Therefore, the Supreme Court held that the FAA superseded state law (the TAA) and that pursuant to the parties' contract, their rights must be decided in an arbitral forum. *Id.* at 352.

There is an important difference between the circumstances presented in *Preston* and those presented here. In this case, the PPA simply imposes statutory restrictions on the authority of municipal employees to agree to arbitration. It does not bar enforcement of valid arbitration agreements or impose conditions upon such agreements not applicable to other contracts. *See Greene, supra*, 806 A.2d at 221. As the court stated in *Greene* in addressing an analogous argument that applies here:

"what [the Bank's] argument does is to mistake the authority of a state to bar enforcement of otherwise valid arbitration agreements — power denied the state except insofar as § 2 [of the FAA] permits — for the authority of a government contracting for goods or services in its own behalf to refuse to agree to arbitrate disputes." *Id.* The FAA does not mandate arbitration; it requires enforcement of privately negotiated arbitration agreements. *Id.* at 222. Here, the PPA withheld from contracting officers the authority to bind the District to arbitration, just as any private corporation or individual might limit an agent's contracting authority. Therefore, we reject the Bank's preemption argument.

### 3. *Controlling Contractual Agreement*

As previously discussed, the trial court ruled that the PPA, which was incorporated into the 2005 contract, withheld from the CFO and OCFO officials the authority to agree to arbitration and forum selection for contract and fraud claims at the time the authorization and agreements for Treasury Services were signed. Alternatively, the trial court found that the parties' 2005 contract provisions governing dispute resolution and contract modification superseded any clauses on the subject that the Bank claims were agreed upon previously and any provision that would otherwise allow District officials to agree to arbitration in North Carolina or elsewhere. The

court also concluded that after execution of the 2005 contract, the Deputy CFO/Treasurer lacked authority to bind the District to dispute resolution clauses in the 2008 deposit agreement. The Bank argues that the trial court erred in its rulings because: (1) it misapplied basic contract integration principles in holding unenforceable the arbitration provisions in the TSB and the forum selection clauses in the Deposit Agreement signed before the 2005 contract; and (2) the 2005 contract cannot supersede documents containing such provisions signed by District officials after the 2005 contract was entered.[40] The Bank contends that the 2005 contract is partially integrated and that the arbitration clause in the TSB and the forum selection provisions in the Deposit Agreements operate harmoniously and must be integrated into the 2005 contract. Alternatively, it argues that subsequently executed agreements control dispute resolution.

a. *Effect of the 2005 Contract on Prior Agreements*

---

[40] The documents the Bank references include: (1) previously and subsequently signed Authorizations incorporating the Treasury Booklet which contained an arbitration clause; (2) Documents in the "Agreements/Documentation" section in its responses to the 2002 and 2005 RFPs; and (3) Treasury Booklets that it contended were sent with its responses to the 2002 and 2005 RFP. However, the trial court found as fact that the Treasury Booklet was not included in these two submissions.

"When parties to a contract have executed a completely integrated written agreement, it supersedes all other understandings and agreements with respect to the subject matter of the agreement between the parties, whether consistent or inconsistent, and is viewed as the sole expression of the parties' intent." *Masurovsky, supra*, 687 A.2d at 202 (citing *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 126-27 (D.C. 1992)) (other citation omitted).  A partially integrated agreement is one "where the writing represents the agreement of the parties with respect to the matters stated therein, but there may be additional consistent terms."  *Id*. (citing *Good Food Servs.*, 608 A.2d at 126)) (other citation omitted). Whether an agreement is completely or partially integrated is a preliminary question of fact for the trial court.  *Id*. at 126 (citing *Ozerol v. Howard Univ.*, 545 A.2d 638, 641 (D.C. 1988)).  In making its factual inquiry, the trial court must consider the intent of the parties when they entered the agreement as derived from "the conduct and language of the parties and the surrounding circumstances."  *Id.*

In this case, before deciding that the parties' 2005 contract rendered ineffective any prior authorizations or agreements for arbitration and forum selection, the trial court held an evidentiary hearing, made factual findings, and considered the factors essential to its determination as set forth in our case law.  *See, e.g.*, *Good Food Servs.,*

*supra*, 608 A.2d at 126 (citation omitted). The trial court concluded that the "parties' written contract containing a merger clause, the conduct of the parties and the surrounding circumstances, evaluated as a whole, weigh heavily in favor of the 2005 contract's categorization as a fully integrated document with respect to dispute resolution and authority to modify." The court also stated that even if the 2005 contract could be characterized as partially integrated, it would supersede any inconsistent terms in prior agreements. *See id*. However, the trial court also found that the parties did not intend for the 2005 contract to invalidate documents signed by OCFO and OFT officials to the extent that they allowed the account to remain open and maintained by authorized individuals.

The trial court's ultimate conclusion that the 2005 contract is a completely integrated document with respect to dispute resolution and authority to modify is supported by the record and applicable law. First, the 2005 contract contains a merger clause that states, "This contract, including specifically incorporated documents, constitutes the total and entire agreement between the parties. All previous discussions, writings, and agreements are merged herein." The presence of a merger clause, although not conclusive, is a significant factor indicating that the parties intended the 2005 contract to be a complete expression of the terms agreed upon.

*Good Food Servs., supra*, 608 A.2d at 127 (II Farnsworth on Contracts § 7.3, at 204-07 (1990)). Second, specific items or documents intended to be included in the contract are listed. A listing of extrinsic items that form a part of the contract is a factor tending to support the conclusion that a contract is completely integrated. *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 928 (D.C. 1992) (holding that this factor, along with two merger clauses, established "beyond peradventure" that the contract was completely integrated). The trial court found that the TSB containing an arbitration clause, aside from not being enumerated as a contract document, was not included in the Bank's response to the 2002 RFP or its 2005 best and final offer.[41] This factual determination is supported by the evidence and not clearly erroneous; therefore, we accept it. *See Psaromatis v. English Holdings I, L.L.C.*, 944 A.2d 472, 481 (D.C. 2008) (setting forth clearly erroneous standard for review of the trial court's factual findings when sitting as fact finder).

---

[41] The trial court did not credit the testimony of the Bank's Senior Vice President Biachi that he mailed the TSB with the 2002 and 2005 responses to the RFP. *See Lazo v. United States*, 54 A.3d 1221, 1230 (D.C. 2012) (stating that this court will not redetermine the trial court's credibility determinations where it had the opportunity to observe the witness' demeanor). Here, the trial court also found that Mr. Biachi, who signed the contract, did not focus on the merger clause, dispute resolution clause, arbitration or the requirements of the PPA, nor did he even know that there was an arbitration provision in the TSB. The trial court also found that at no time did the parties discuss dispute resolution before the award of the 2005 contract.

Third, the trial court considered the circumstances surrounding the making of the contract before determining that it was fully integrated, specifically as to dispute resolution and modification authority. *See Good Food Servs., supra*, 608 A.2d at 126 (setting forth surrounding circumstances as one focus of the inquiry into whether the parties intended an agreement to be completely integrated). Briefly stated, these circumstances included the OCFO's "effort[s] to assert control over the District's finances, including its bank accounts," in part, by issuing the 2002 RFP.[42] The trial court found that "[a]n important part of that endeavor was empowering only one person to contractually bind the District, and except for claims under the False Claims Act, establishing only one method of resolving disputes — through the Contracting Officer." To this end, the RFP provided that only the Contracting Officer is authorized to make modifications or changes to the terms and conditions of the contract. The RFP further required that bidders include a dispute resolution provision stating that "[i]f a dispute arises under or relates to the contract, a claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A Claim by the District against the Contractor shall be subject to written decision by the Contracting Officer." Contract clauses required by the RFP also included the incorporation by reference of the PPA and applicable regulations

---

[42] The trial court found that there were 1400 bank accounts when Dr. Gandhi was appointed CFO in June 2000.

and the laws of the District of Columbia. Except for fraud claims, the PPA provided for only one form of dispute resolution for contract claims, *i.e.*, that they be resolved by the Contracting Officer. The PPA provides that contracting officers are "not authorize[d] . . . to settle, compromise, pay, or otherwise adjust any claim involving fraud." D.C. Code § 2-308.03 (a)(4) (2006 Repl). It also provides that the District may bring a civil action in Superior Court for fraud claims. D.C. Code § 2-308.14.[43]

The District issued an amendment to the RFP on March 31, 2005, but the terms and conditions related to dispute resolution, contract modification, and incorporation of the PPA and other laws of the District of Columbia remained unchanged. Consistent with the RFP's requirements, the 2005 contract executed by the parties states in Article I that "[t]he intent of this contract is for a contractor to manage the disbursement account in accordance with the published RFP."[44] The trial court found that "[s]ignificantly, the Treasury Booklet was not included as part of the [Bank's] 2002 RFP Response and the 2005 [Best and Final Offer] that were incorporated into the 2005 Contract that Mr. Bianchi [the Bank's Senior Vice President] signed." This

---

[43] D.C. Code § 2-308.14 is now codified at D.C. Code § 2-381.02 (a).

[44] The contract incorporated the following documents "by order of precedence:" Articles I through V; Contractor's Technical Proposal and Cost Proposal; Contractor's Best and Final Offer dated April 25, 2005; and the District's RFP.

factual finding, which is supported by the evidence, is not challenged. Given the language in the written contract, the conduct of the parties, and the surrounding circumstances as found by the trial court, we discern no error in its conclusions that objectively the parties intended the 2005 written contract to govern their relationship related to the CDA with respect to dispute resolution and authority to modify the agreement and that any prior inconsistent provisions on these subjects were superseded by the 2005 contract.[45] "Our jurisdiction adheres to an objective law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract[.]" *Aziken v. District of Columbia*, 70 A.3d 213, 218-19 (D.C. 2013) (internal quotation marks omitted).

The Bank argues that the trial court erred by failing to harmonize the dispute resolution provisions of the 2005 contract and the TSB's arbitration clause. It contends that the TSB and Deposit Agreement operate harmoniously with the 2005 contract, and therefore must be construed together as one contract. In interpreting a

---

[45] *See Good Food Servs., supra*, 608 A.2d at 126-27 (setting forth basis for determining the preliminary factual issue of whether the parties intended a writing to be integrated); *see also Ozerol*, 545 A.2d at 641 (contrasting completely and partially integrated agreements and noting that the latter may have consistent, as opposed to inconsistent, additional terms).

contract, we consider the document as whole "so as to give effect, if possible, to all of the provisions in the contract." *Steele Found. Inc. v. Clark Constr. Grp.*, 937 A.2d 148, 154 (D.C. 2007) (citing *Akassy, supra*, 891 A.2d at 303). Contrary to the Bank's argument, the dispute resolution mechanism agreed upon in the 2005 contract and the prior arbitration and forum selection clauses upon which it relies cannot be reconciled or harmonized.[46] As the trial court concluded, the mechanisms for dispute resolution agreed upon in the 2005 written contract are inconsistent with any prior arbitration and forum selection provisions calling for arbitration in North Carolina that the Bank contends were agreed upon prior thereto. The provisions in the 2005 contract, solicited, negotiated, and agreed upon in writing, provide that: (1) except for fraud claims, claims related to the parties' contract will be decided by the Contracting Officer and Contract Appeals Board; and (2) fraud claims can be pursued in a civil

---

[46] *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278 (2d Cir.), upon which the Bank relies, is distinguishable. In that case, the district court determined that merger and forum selection clauses in a series of subsequently executed Pledge Agreements superseded a prior agreement to arbitrate disputes. *Id.* at 280. The Pledge Agreements had a clause providing that "all rights and remedies provided in this Agreement are cumulative and not exclusive of any provided under any other agreement or by law or in equity." *Id.* at 282. The circuit court stated that in light of this clause, it would make little sense to read the merger clause to destroy prior contract relationships. *Id.* at 283. Consistent with New York law, the court "read the merger clause as providing that the Pledge Agreements supersede any previous agreements only to the extent that they conflict. *Id.* In the case before this court, we have no similar non-exclusive remedies provision, and the terms of the dispute resolution provisions in the written contract and prior documents conflict.

action in court by the Attorney General as stated in the PPA, which was incorporated by reference. These provisions are entirely inconsistent with any prior agreements to arbitrate claims in North Carolina or elsewhere. Even if the 2005 agreement is characterized as only partially integrated, prior inconsistent terms with respect to the matters stated therein were superseded by the 2005 contract, and therefore, they cannot control. *See Masurovsky, supra* note 11, 687 A.2d at 202 (citing *Good Food, supra*, 608 A.2d at 126) (other citation omitted). To the extent that provisions for dispute resolution and forum selection are referenced on bank signature cards and authorizations pre-dating the parties' 2005 contract, for the foregoing reasons, we agree with the trial court that they were superseded by the 2005 contract and cannot be harmonized with it.

b. *Effect of Subsequently Executed Documents on the 2005 Contract*

Alternatively, the Bank argues that TSB and Deposit Agreements signed by OFT officials after the 2005 contract was entered control.[47] It contends that for

---

[47] The Bank relies on the 2006 Authorization agreeing to be bound by the TSB, signed by Deputy Chief Financial Officer, Lasana Mack, pursuant to authority provided by the 2000 Corporate Resolution, and signature cards signed in 2006. The TSB provides for arbitration in the United States, and the Deposit Agreements provide for actions or proceedings involving the account to be maintained in the

(continued...)

partially integrated contracts, the most recent writing controls or that the 2005 contract could be supplemented or modified by documents executed thereafter. The Bank takes the position that OFT officials retained independent contracting authority under the 2000 Corporate Resolution and that by signing signature cards and Authorizations, OFT employees bound the District to the Deposit Agreement's forum selection clause and the Treasury Booklet's arbitration clause. The Bank argues that these documents either reinstated the terms of the TSB and Deposit Agreement or modified, supplemented, and amended the terms of the 2005 Contract to include them.[48] The trial court held that after execution of the 2005 contract, which was extended each year up to November 2009, OFT officials "plainly lacked the authority to bind the District to the dispute resolution clauses in either the 2004 Treasury Booklet or the 2008 Deposit Agreement."

There are at least two major impediments to the Bank's suggested result on this issue. First, the RFP and the 2005 contract provided that the Contracting Officer was

[47](...continued)
Banking Center maintaining the account, in this case North Carolina.

[48] The District suggested that this court need not consider whether OFT employees retained contracting authority after the 2005 contract was executed because it did not understand the Bank's argument to be that subsequent agreements altered or modified the terms of the existing contract. In its Reply Brief, the Bank clarified its position to state otherwise.

the "only official authorized to contractually bind the District." Even assuming that OFT officials retained some authority related to banking services after the execution of the 2005 contract, the Bank, as a party to that contract, knew that only the Contracting Officer had authority to agree on behalf of the District to modify or vary its terms. Even absent actual knowledge of the limitations on a government agent's authority, as existed here, "one who contracts with a government agent is constructively notified of the limits of that agent's authority, and any reliance on contrary representations cannot be reasonable." *Williams v. District of Columbia*, 902 A.2d 91, 96 (D.C. 2006) (citing *Leonard v. District of Columbia*, 801 A.2d 82, 86 (D.C. 2002) and *Greene, supra*, 806 A.2d at 222 n.7 ("persons dealing with a municipal corporation through its agent are bound to know the nature and extent of the agent's authority") (quoting *Coffin, supra*, 320 A.2d at 303)) (other citations omitted). Put another way, the Bank knew that whatever authority other officials had to sign bank documents on behalf of the District, that authority did not include modification of the parties' 2005 contract. Therefore, the Bank could not bind the District to a modification of the dispute resolution provisions in the 2005 contract simply because officials, other than the authorized Contracting Officer, signed form bank signature cards and/or deposit agreements with printed language purporting to impose different arbitration and forum selection requirements. The trial court found that the individuals

who signed these cards for the District were unaware that the fine print had arbitration and forum selection terms. According to the testimony and trial court findings, they signed the documents only for the purpose of adding or changing signatories on the accounts without noting the fine print. None of them intended to effect a modification of the 2005 contract. Of course, "[a] person who signs a contract after having had an opportunity to read and understand it is bound by its provisions." *Interdonato v. Interdonato*, 521 A.2d 1124, 1133 (D.C. 1987) (citation omitted). However, that is not the issue here. The determinative issue in this case is whether the person who signed the document had authority to bind the District government to a modification of the 2005 contract. Under the terms of that contract, only the Contracting Officer had that authority.

Second, the 2005 contract was extended four times after its initial execution, finally in November 2008 and expiring "on November 12, 2009 or the date any new contract was executed, whichever came first." This contract's essential terms concerning dispute resolution, incorporation of the PPA, and contract modification remained unchanged throughout this period. Therefore, to the extent that the Bank argues that the last executed document controls, that would be the 2005 contract that was extended each year through November 2009. Therefore, under the Bank's

modification analysis, this contract would have continued to govern dispute resolution and contract modification.

C.  *Challenge to the CAB's Jurisdiction Over the Claims Asserted*

Finally, the Bank argues that there is no conflict between the dispute resolution provisions in the 2005 contract and the arbitration provision it seeks to enforce because the District's claims are not subject to the jurisdiction of the Contracting Officer or CAB.  It contends that the District's claims are either statutory or tort claims which the Contracting Officer and CAB have no authority to resolve.  The District views the Bank's argument as its recognition  that by incorporating the PPA into the contract, the parties agreed that the Contracting Officer would hear contract claims, and the Attorney General for the District could bring an FCA claim in Superior Court. At the same time, the District agrees with the Bank that its claims do not fall within the provision of the 2005 contract requiring that the contracting officer decide disputes related to the contract.  It contends that its statutory and tort claims against the Bank do not turn on the contractual relationship between the parties and that they could have been asserted against any bank that negotiated the fraudulent checks.  Therefore, the District  concedes that the trial court erred in holding that the District's claims related

to the contract, but takes the position that the claims should have been resolved in Superior Court.

Under the PPA, "[a]ll claims by the District government against a contractor arising under or relating to a contract shall be decided by the contracting officer who shall issue a decision in writing. . . ." D.C. Code § 2-308.03 (a)(1) (2001). The Contract Appeals Board had jurisdiction of "[a]ny claim by the District against a contractor, when such claim arises under or relates to a contract." D.C. Code § 2-309.03 (a)(3) (2001). The statute limits this jurisdiction by providing that the contracting officer is not authorized "to settle, compromise, pay, or otherwise adjust any claim involving fraud." D.C. Code § 308.03 (a)(4) (2001). The PPA provides that the District may bring a civil action to recover damages or penalties against any person who commits specified fraudulent acts. D.C. Code § 2-308.14 (a)(1)-(9).

A claim arises under a contract "(1) where the claim ultimately depend[s] on the existence of a contractual relationship between the parties; (2) resolution of the claim[] relates to interpretation of the contract; or (3) [a] contract-related tort claim involve[s] the same operative facts as a parallel claim for breach of contract." *Cheney v. IPD Analytics, LLC*, 583 F. Supp. 2d 108, 122 (D.D.C. 2008) (alteration in original)

(quoting *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 694 (8th Cir. 1997)) (internal quotation marks omitted). There must be a "causal connection between the claim and the contract based on rights, duties, or injury flowing from the contract." *Id.* at 122 (quoting *Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007)) (internal quotation marks omitted). The statute does not define "related to" the contract or distinguish between the phrases "arising under" and "related to" the contract. The definition of "related to" is simply "associated with" or "connected to."[49] There must be some nexus between the contract and the claim asserted such that reliance on the contracting officer's expertise promotes a just resolution.

It is not clear on this record that the District's claims arise under the parties' contract based on the definition extracted from *Cheney, supra*, 583 F. Supp. at 122. The District sued the Bank for violation of the Uniform Commercial Code (Counts I and II), Negligence (Count III), Fraud (Count IV), Negligent and Intentional Breach of Fiduciary Duties (Count V), Conversion (Count VI), False Claims Act violations (Count VII),[50] and Failure to Adequately Hire, Train or Supervise (Count VIII).

---

[49] *The American Heritage Dictionary of the English Language*, 1097 (William Morris, ed. 1969).

[50] In Count VII of its first amended complaint, the District adopted and incorporated the factual allegations set forth in the preceding eight counts (paragraphs
(continued...)

Resolution of none of the claims appear to concern an interpretation of the contract, and there is no parallel breach of contract claim. To some extent, some of the claims may depend upon the existence of a contractual relationship between the parties. *See Cheney, supra*, 583 F. Supp. at 122. Others may not. Nor do all of the claims appear on the face of the complaint to be connected to the contract itself or require the expertise of a contracting officer for just resolution. Further inquiry by the trial court appears to be necessary to make that determination.

This court has held that the CAB does not have jurisdiction over a claim for professional negligence, recognizing the CAB's position with respect to its own jurisdiction. *District of Columbia Water and Sewer v. Delon Hampton & Assocs.*, 851 A.2d 410, 417 n.16 (D.C. 2004) (citing *George A. Bass Constr. Co.*, CAB No. D-869 (June 10, 1991)).[51] In particular, this court noted that the CAB had stated that "'any

---

[50](...continued) 1 - 117) of its complaint as the basis for its False Act Claims under D.C. Code § 2-308.14 (a), subsections (2) (knowingly mak[ing], us[ing] or caus[ing] to be made or used, a false record or statement to get a false claim paid or approved by the District"), (3) ("conspir[ing] to defraud the District by getting a false claim allowed or paid by the District"), (8) (failing to disclose after discovery a false claim to the District received as an inadvertent payment or overpayment), and (9) (knowingly failing to repay an inadvertent payment or overpayment to the District).

[51] In *Delon Hampton*, an issue under consideration was whether the trial court abused its discretion in not referring claims for breach of contract and professional negligence for administrative remedy under the doctrine of primary jurisdiction. 851

(continued...)

action based on negligence lies not before the Board but in Superior Court.'" *Id.*

(quoting *Bass Constr. Co.*). More recently, the CAB has explained that it may

exercise jurisdiction over claims that actually are for defective contract performance,

although asserted in the language for tort actions. *In re Chief Procurement Officer*

(*GTE South, Inc.*), 2002 DCBCA LEXIS 23, at *3-4 n.2. Although the CAB

dismissed the tort claims in *GTE South* because its jurisdiction is limited to contract

actions, it explained circumstances under which it had considered cases asserted as

torts, but that were actually contract claims. Specifically, the CAB stated:

> Although, at times, the Board exercises jurisdiction over
> claims which are framed in the language of tort actions,
> those cases deal with contract performance, not torts
> unrelated to performance. For example, references to
> "negligence" and "professional malpractice" in performance
> of a contract, although sounding like a tort, do not convert
> into a tort what is in essence a claim for defective
> performance. *See, e.g.*, *Fry & Welch Associates, P.C.*, CAB
> No. D-0821, July 31 1997, 44 D.C. 6859, 6875.

*GTE South*, 2002 DCBCA LEXIS 23 at *3-4 n.2. Whether the District's claim for

---

[51](...continued)
A.2d at 416-17. The trial court rejected the argument because the CAB would have
declined to provide an administrative remedy, and the doctrine of primary jurisdiction
does not apply where no administrative remedy exists. *Id.* at 417 & n.417 n.16.

negligence (Count III) is in essence a claim for defective performance remains to be determined after further inquiry by the trial court.

On the other hand, most of the District's claims appear to involve fraud perpetrated by the District's former employees and allegedly facilitated by the Bank. To the extent that these claims involve fraud, they are properly pursued in court, given the PPA's prohibition against contracting officers paying, compromising, settling or otherwise adjusting any claim involving fraud, *see* D.C. Code § 308.03 (a)(4), and authorization for the District to sue persons committing certain fraudulent acts in Superior Court for damages. *See* D.C. Code § 2-308.14 (a)(1). Interpreting a similar federal statute, 41 U.S.C. 605(a), numerous district courts have held that the Government can sue in district court whenever fraud is at issue even if the claim itself is not for fraud. *United States v. Menominee Tribal Enterprises*, 601 F. Supp. 2d 1061, 1078 (E.D. Wis. 2009) (citing *United States v. Unified Industries*, 929 F. Supp. 947, 950-51 (E.D. Va. 1996); *United States v. Rockwell Int'l Corp.*, 795 F. Supp. 1131, 1135 (N.D. Ga. 1992)). Similarly, the provision of the PPA lends itself to that same interpretation.

In summary, we conclude that the District's claims in the remaining seven counts may not be dismissed in favor of jurisdiction before the contracting officer and

the CAB without a determination of whether those claims can be properly pursued in that forum or are properly before the Superior Court. That determination must be made on the basis of the nature of the claim, rather than its title. Consistent with the principles set forth in this section, the trial court must make that determination with respect to each count.

For the foregoing reasons, we affirm the trial court's decision insofar as it holds that the parties had no agreement to arbitrate disputes in North Carolina. We remand the case to the trial court with instructions to determine, based on the principles enunciated in this opinion, which counts, if any, should remain for disposition in the Superior Court as claims involving fraud or as claims not otherwise within the jurisdiction of the Contract Appeals Board.

*So ordered*.